## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

SPINE & JOINT SURGICAL INSTITUTE
OF MICHIGAN SOUTHFIELD LLC

                Plaintiff,

v.

SURGICAL CENTER OF SOUTHFIELD,
LLC D/B/A FOUNTAIN VIEW
SURGERY CENTER, MEDICAL
CONTINUUM MANAGEMENT, LLC,
ATLAS ORTHOPEDICS, PLLC,
MAKINO INVESTMENTS, L.L.C.,
ROBERT D. SWIFT, D.O., DAVID W.
WILLIAMS, JEFFREY J. CARROLL,
D.O., and MARK L. GOLDBERGER,
D.O.,

                Defendants.

**Case No. 2021-11316**

Honorable Matthew F. Leitman
Magistrate Judge Elizabeth A. Stafford

## FIRST AMENDED COMPLAINT

Plaintiff Spine & Joint Surgical Institute of Michigan Southfield LLC ("S&J" or "Plaintiff") by and through its undersigned counsel, by way of its Complaint against Defendants, Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center ("Fountain View"), Medical Continuum Management, LLC, Atlas Orthopedics, PLLC, Makino Investments, L.L.C., Robert D. Swift, D.O., David W. Williams, Jeffrey J. Carroll, D.O., and Mark L. Goldberger, D.O., hereby states and alleges as follows:

39330922.4

## I.  Summary of the Case

1.     The Defendants in this case attempted to offload their floundering business—an ambulatory surgery center ("ASC")—onto Plaintiff.  Well aware that the ASC was underperforming, Plaintiff nevertheless pursued the deal, seeing value in the center's good will, real property, equipment, and the various licenses, accreditations, and payer contracts already in place.  What Plaintiff did not see, however, was that the ASC was in reality a ticking time bomb.  Defendants hid the fact that the center was effectively the Michigan headquarters for a multi-state fraud scheme that saw one co-conspirator convicted in New York, while threatening others in a civil RICO in this Court.  At a minimum, Plaintiff would have never agreed to acquire the ASC had Defendants been forthcoming as to that lawsuit or the various billing improprieties at the heart of it.  And although the parties did not consummate the transaction, Plaintiff nevertheless suffered significant harm including, without limitation, the loss of its deposit, a missed opportunity for a subsequent transaction based on the ASC, and significant time and expense spent in pursuit of the deal.

## II.  Parties, Jurisdiction, and Venue

2.     Plaintiff Spine & Joint Surgical Institute of Michigan Southfield LLC ("S&J") is a Michigan limited liability company with its principal place of business in Oakland County, Michigan.

3.     Defendant Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center ("Fountain View") is a Michigan limited liability company.

4.     On information and belief, all of the equity interests in Fountain View are owned, directly or indirectly, by the remaining Defendants.

5.     Defendant Medical Continuum Management, LLC is a Michigan limited liability company that conducts business in Oakland County.

6.     Defendant Atlas Orthopedics, PLLC, is a Michigan professional limited liability company that conducts business in Oakland County.

7.     Defendant Makino Investments, L.L.C. is a Michigan limited liability company that conducts business in Oakland County

8.     Defendants David W. Williams, Jeffrey Carroll, D.O., Mark Goldberger, D.O., and Robert Swift, D.O. are individuals residing in Michigan.

9.     Plaintiff asserts a claim under 18 U.S.C. § 1962(d), as well as contract and fraud claims arising under Michigan law.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1337, and 1367.

10.     Venue is proper in this Court under 28 U.S.C. § 1391 because a significant portion of the events, acts, and omissions giving rise to this action occurred in this District and because Defendants reside, transact business, and are found in this District.

### III. GENERAL ALLEGATIONS

11.     S&J is a premier surgical group that offers best-in-class orthopedic surgical services across various specialties, including spine surgery, orthopedic sport surgery, hand surgery, foot and ankle surgery, and pain management procedures.

12.     Defendant Fountain View owns and operates a freestanding outpatient surgical facility certified for participation in Medicare as an ambulatory surgery center. Ambulatory surgery centers (or outpatient surgery centers) are health care facilities that offer patients surgical procedures that do not require an overnight hospital stay.  In addition to having an ownership interest in Fountain View, Defendant Williams operates and manages Fountain View.

13.     In or around November of 2020, S&J became interested in potentially acquiring (the "Transaction") Fountain View's ambulatory surgery center located at 29110 Inkster Road in Southfield, Michigan (the "ASC").  S&J's CEO, Abe Baydoun, contacted Williams to express S&J's interest in acquiring the ASC.  Baydoun and Williams became the main points of contact for the parties in connection with the Transaction.[1]

14.     During the course of negotiations, the parties discussed and negotiated the key terms for the Transaction including, among others, purchase price, a timeline for

---

[1] Except for the allegations in Count II, and unless otherwise indicated, Williams' actions described herein were on his own behalf and on behalf of the other Defendants (including Fountain View).

closing, and various closing conditions. Also relevant to the parties' discussion was a lawsuit filed by no-fault automobile insurance providers against Fountain View and others and the potential risks arising out of that lawsuit.

### A.    The Allstate Lawsuit

15.    In July of 2020, Allstate and Esurance sued Fountain View and several other associated defendants in this Court (the "Lawsuit"). *See Allstate Insurance Co., et al. v. ISpine, PLLC, et al.*, No. 20-12008, July 28, 2020 (E.D.MI). The plaintiffs in the Lawsuit allege that Fountain View, together with the other defendants, engaged in a fraudulent enterprise whereby they engaged in an unlawful referral/kickback arrangement, and submitted numerous false and fraudulent records, bills, and invoices for purposes of receiving payment from insurance providers for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered under applicable law.[2]

16.    Early on in their negotiations relating to the Transaction, Baydoun expressed concern about the Lawsuit and the possibility that it could potentially expose S&J to certain risks if it were still pending after S&J acquires Fountain View. Of additional concern to Baydoun was the fact that S&J had reached a tentative agreement with a third party for a transaction involving the ASC. The Lawsuit could have potentially delayed or dismantled this follow-on deal.

---

[2] Section F, below, discusses the Lawsuit in further detail.

17.     In or around November of 2020, prior to the parties executing the Agreement, Williams assured Baydoun that Fountain View would be settling the Lawsuit soon and that there was no reason for Baydoun to be concerned.  Williams and Baydoun continued to discuss the potential Transaction in January and February of 2021, including during telephone conversations on January 19, 26, and 28, and February 12.  During each of these calls, Williams continued to tell Baydoun that S&J "had nothing to worry about" regarding the Lawsuit, that Fountain View was "very close" to settling it, and that this settlement would take place before the anticipated closing date (the "Closing") for the Transaction.

18.     Unbeknownst to Baydoun, Williams was misleading him all along.  During those calls, Williams was fully aware that the Lawsuit would not settle before Closing, and he misrepresented this fact for the specific purpose of inducing S&J to commit to the Transaction.

19.     By making these assurances, Williams intended to induce Baydoun into executing a purchase agreement and paying a large sum as a deposit to acquire the ASC.  Relying on Williams's assurances that Fountain View would settle the Lawsuit, Baydoun executed such an agreement.

**B.     The Asset Purchase Agreement**

20.     On December 9, 2020, the parties entered into an asset purchase agreement (the "Initial Agreement").  Pursuant to the Initial Agreement, S&J purported to acquire

from Fountain View substantially all of the assets, and certain specified liabilities, of the ASC for the agreed-upon price of $4.5 million.  In connection with executing the Initial Agreement, S&J paid Fountain View a deposit of $300,000 (the "Original Deposit") that the parties agreed would apply as a credit toward the purchase price.

21.     As further discussed below, certain provisions in the Initial Agreement were later amended by the parties pursuant to a written Amendment to Asset Purchase Agreement (the "Amendment") dated January 30, 2021 (the Initial Agreement and the Amendment, collectively, the "Agreement").[3]

## C.     Key Provisions in the Agreement

22.     _Closing Date_.  Section 3.1 provides that the Closing was to take place on the earlier of (a) December 31, 2020 and (b) the first business day after all of the conditions to closing (set forth in Article VII of the Agreement) were either satisfied or waived, or at some other time if agreed upon by the parties.

23.     _Closing Conditions_.  Section 7.2(e) of Agreement required that, as of the date of the Agreement, no "Material Adverse Effect" had taken place, nor had any event occurred that could reasonably have been expected to result in a "Material Adverse Effect."[4]

---

[3]  The Agreement is attached hereto as Exhibit A.

[4]  The Agreement defines "Material Adverse Effect," in pertinent part, as any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of

24.     *Representations and Warranties*.     At the time of the Agreement,

Defendants represented and warranted in Section 4.14 that they had, at all times,

complied with all laws applicable to the operation of the ASC as well as all health care

laws.  In Section 4.20, Fountain View further affirmed that no representation or warranty

in the Agreement, nor any statement contained in the accompanying disclosure schedules

or documents furnished to S&J, contained any untrue statement of a material fact or

omitted a material fact necessary to make the statements contained in the Agreement, in

light of the circumstances in which they were made, not misleading.

25.     *Exclusivity*.  Defendants agreed in Section 6.3 not to enter into discussions

or negotiations with, or provide any information to, any person or entity in connection

with any inquiry, proposal or offer from any such person or entity relating to the direct or

indirect disposition of all or any portion of the ASC or its assets (a "Proposal").

Defendants further agreed that, within three business days after receiving a Proposal, a

request for information with respect to any Proposal, or any inquiry that could reasonably

be expected to result in a Proposal, Fountain View would advise S&J orally and in

writing of any such Proposal, request, or inquiry, and inform S&J of (a) the material

terms and conditions of, and (b) the identity of the party making, any such Proposal,

request, or inquiry.  The parties further agreed that Fountain View's non-compliance with

---

operations, condition (financial or otherwise) or assets of Fountain View or the ASC, (b)
the value of the assets to have been acquired by S&J, or (c) the ability of Fountain View
to consummate the transactions contemplated in the Agreement on a timely basis.

the disclosure requirements described above would cause irreparable harm to S&J for which money damages would not provide an adequate remedy.

26.     _Indemnification_.  Pursuant to Section 8.2 of the Agreement, Fountain View agreed to indemnify S&J for any and all "Losses"[5] incurred or sustained by, or imposed upon, S&J based on or arising out of:

      a.  Any inaccuracy in or breach of any of Fountain View's representations or warranties or any documents it furnished to S&J pursuant to the Agreement;

      b.  Any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Fountain View under the Agreement or any related documents; or

      c.  Any "Excluded Liability."[6]

27.     _Notice of Suit_.  Section 8.5 of the Agreement required S&J to provide Defendants with written notice of a direct claim for indemnification before filing suit.

---

[5] As defined in the Agreement, "Losses" include losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; provided, however, that "Losses" shall not include punitive damages, except to the extent actually awarded to a Governmental Authority or other third party.

[6] As defined in the Agreement, "Excluded Liabilities" means any liabilities of Fountain View of any kind or nature other than certain specified "Assumed Liabilities."  The "Assumed Liabilities" consisted of contractual liabilities of Fountain View required to be performed after the Closing that were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Fountain View prior to the Closing.

S&J provided such notice in a letter dated March 23, 2021, which discussed S&J's breaches of the Agreement.

28. *Recovery*. Direct claims for indemnification are limited by Section 8.4(a) of the Agreement, which caps the aggregate amount of all "Losses" for which Defendants shall be liable at $4.5 million. Section 9.2(b), however, provides that nothing contained in the Agreement shall relieve the parties from liability for any willful breach of the Agreement's terms.

**D.    The Amendment**

29. Upon executing the Initial Agreement the parties anticipated that the Closing would take place on or around December 31, 2020, and the Initial Agreement contemplated a Closing on the earlier of that date and one business day after the day on which all closing conditions became satisfied. Relatedly, Section 9.1 provided that each of the parties could terminate the Agreement if the Closing did not take place on or before December 31, 2020, with differing consequences for each party depending on the basis for any such termination.

30. Later, on January 30, 2021, the parties agreed to amend the Initial Agreement via the Amendment. The Amendment provided that the Closing would take place *only* upon the satisfaction of all closing conditions, while allowing each party to terminate if the Closing did not take place on or before March 5, 2021. In other words, the Amendment reflected the parties' intent to move the Closing date to March 5.

31. Pursuant to the Amendment, S&J paid an additional deposit (the "Additional Deposit") in the amount of $175,000, which would not be credited toward the purchase price and also agreed to pay certain of Fountain View's expenses, as listed below:

    a. Fountain View's rent expense, in the event the Closing were not to occur before March 3, 2021;

    b. $2,000 for each day between March 1, 2021 and March 5, 2021 that the Closing did not occur; and

    c. Fountain View's reasonable expenses actually paid for operating the ASC between March 1, 2021 and the earlier of March 5, 2021 or Closing, provided that Fountain View substantiate such reasonable expenses with supporting documentation.

32. S&J did in fact pay these expenses to Fountain View.  S&J later discovered, however, that Williams had misrepresented the amount of these expenses, causing S&J to pay more than it otherwise agreed.

**E.    Williams Reveals that Fountain View had no Plans to Settle the Lawsuit**

33. Throughout January and February, Williams continued to represent to Baydoun that Fountain View would settle the Lawsuit before the Closing.  This was an important consideration for S&J.  While the Agreement provided S&J a right to indemnification in connection to the Lawsuit, that right did not fully protect S&J given the circumstances at hand.

34. For instance, S&J had arranged for a subsequent transaction that was dependent on S&J's acquisition of the ASC, and the Lawsuit would most likely delay

and therefore jeopardize the subsequent transaction.  Indeed, Williams was well aware of the related transaction, and also knew that it was a key reason that S&J insisted on Fountain View settling the Lawsuit prior to Closing.  Additionally, the Lawsuit's serious allegations of billing improprieties against Fountain View made it possible that the ASC could lose its ability to operate or bill providers.  And given that the ASC is unique real property, with certificates of need, licenses, contracts, etc. unique to it, and is located in a market that S&J specifically wanted to enter, simple indemnification would be insufficient to protect S&J's very specific interests in the ASC at the time.

35.     As the anticipated Closing date drew closer, Williams finally revealed Fountain View's true intentions relating to the Lawsuit.  In a series of text messages between Baydoun and Williams on February 28, 2021, Baydoun yet again sought assurance from Williams that the Lawsuit would settle, stating:

> "Good morning.  Where are you in the settlement of the
> RICO [Lawsuit]?  Did you get it finalized and dismissed yet
> or are they waiting on payment of some sort."

36.     In his response, Williams indicated for the first time that the Lawsuit would not settle before the anticipated Closing date of March 5, 2021, stating: "The case is ongoing, will be so for some time and we feel very good about its direction."

37.     Williams further asserted that he would not agree to set aside any dollar amount in escrow for the Lawsuit, going so far as to suggest that there was no possibility of liability for Fountain View: "I will not agree to a holdback for a liability that doesn't

exist." Williams was wrong, of course. The case remains pending, meaning that there is indeed a liability risk.

38.     Williams's response was completely at odds with his efforts over the previous months to downplay and minimize the Lawsuit, stating numerous times to Baydoun that it should not concern him.

39.     Baydoun, of course, was concerned. Following up with Williams the next day, Baydoun asked: "Is your plan to settle the [Lawsuit] out or drag it out through the courts?" Williams first responded by claiming that this information was "confidential." He then asserted that he had "[no] plan to give in to a baseless lawsuit." Finally, Williams again misrepresented to Baydoun that he had "nothing to worry about." This was simply wrong—as S&J would later learn, the very same scheme described in the Lawsuit had already led to a criminal conviction of one of the individuals involved.[7]

40.     Williams completely changed his representations about the Lawsuit, first stating unequivocally that the Lawsuit would settle, only to later backtrack and admit that

---

[7] The individual involved, Blake Barber, had a history of engaging in similar schemes before being convicted in New York. *See* https://www.nytimes.com/2021/09/17/business/pelvic-mesh-personalinjury- scheme.html ("Barber was one of the architects of the scheme, according to prosecutors, and a firm he worked with helped arrange for the surgical procedures to be performed at outpatient medical centers in Florida—some in nondescript strip malls. The procedures were paid for with money from high-interest cash advances arranged by a group of so-called litigation finance firms . . . . The charging document filed by prosecutors in 2019 said the women had been unaware that Dr. Walker and others who had performed the implant removal surgery had paid kickbacks and bribes to Mr. Bather's firm and others for the surgical referrals.")

it would not settle before Closing, but that the Lawsuit had no potential for liability and that Baydoun need not concern himself with it.  Williams knew that these representations were false because, as discussed below, he was well aware that Fountain View had been engaging for years in an unlawful scheme involving fraudulent billing, unlawful solicitation of patients, and kickbacks.  Williams omitted these material facts in an effort to induce Baydoun and S&J to proceed to consummate the Transaction, financially benefitting all Defendants.[8]

41.    Williams' about face regarding the Lawsuit, just a week before the anticipated Closing, raised red flags for S&J and spelled the beginning of the end for the Transaction.  S&J began taking a deeper look at the Lawsuit, including various discovery documents.  S&J eventually discovered the other lawsuits involving similar claims and related parties.

42.    As detailed below in Section F, S&J ultimately discovered that Fountain View was involved in a sophisticated fraud scheme with several other actors.  As part of this scheme, Fountain View engaged in a variety of fraudulent billing practices and an unlawful referral and kickback arrangement. Fountain View sent the fraudulent bills to Allstate and other insurance providers via U.S. mail, wire transfer, or other channels of interstate commerce, in violation of various state and federal laws including , including the federal False Claims Act, the Michigan No-Fault Act, and 18 U.S.C. §§ 1341, 1343.

_____

[8] The Lawsuit eventually did settle in September of 2019.  On information and belief, the

**F.     S&J Learns Additional Details Regarding Fountain View's Involvement in the Unlawful Scheme**

43.     In the Agreement, Defendants represented and warranted that they had, at all times, complied with all laws applicable to the operation of the ASC and had at all times complied with applicable laws and regulations, including all health care laws. S&J discovered that Fountain View was engaged in an unlawful and intentional scheme to collect millions of dollars from insurance providers for treatment and services that were never performed, medically unnecessary, improperly billed, or in violation of applicable law. Fountain View's involvement in the scheme not only breached its representations and warranties, but also gives rise to independent claims for common law fraud, fraudulent inducement, and a private right of action for violation of the RICO Act.

44.     While S&J continues to gather information, the unlawful scheme involves improper referrals/kickbacks and fraudulent billing for excessive and/or medically unnecessary surgical and other procedures performed at Fountain View by an entity called ISpine, PLLC ("ISpine").

45.     ISpine is a Florida company owned by a neurosurgeon named Stefan Pribil, D.O. ("Pribil"). Pribil was initially recruited to work with a different surgery center in Michigan by an individual named Wesley Barber ("Barber"), who became acquainted with Fountain View in or around mid-2017, after meeting one of Fountain View's then-owners, Mohammad Jaura. At all relevant times, ISpine was operated and directed by,

_____

settlement included a payment from Fountain View to the plaintiff.

among others, Fountain View, Swift, Pribil, and Barber; and Fountain View was operated and directed by, among others, ISpine, Pribil, Barber, Williams, and Swift.

46. Later in 2017, ISpine began performing surgical procedures at Fountain View. Pribil (ISpine's owner) made Barber the "sole practice administrator" of ISpine. Barber's role was to "manage the practice and find patients." Indeed, Barber is at the center of the unlawful scheme, the objective of which is to use bribes and kickbacks to maximize the dollar amount billed by clinicians to insurance providers and then sell the accumulated amounts owed by the insurance providers to third-parties.

47. The scheme involved Barber and his associates acting as "runners" or "steerers," with the intent to falsely or fraudulently obtain benefits from insurance providers. These "runners" would solicit individuals that, for various reasons, *might* need surgery and would solicit and engage these individuals for the purpose of convincing them that they did, in fact, need surgery. Barber and his associates would then direct those patients to ISpine, Pribil, Swift, and Fountain View for the surgeries, all of whom were aware of the scheme and who would directly or indirectly compensate the "runners" for their referrals. Barber and his associates would also benefit by selling medical debt arising out of these surgeries.

48. Barber and ISpine have been implicated in other similar schemes around the country, all of which involve the same *modus operandi*. *See Plummer v. McSweeney, et al.*, No. 18-00063 (Jan. 24, 2018, E.D. Ark.); *Allstate Ins. Co. et al. v. Mercyland*

*Health Svcs.*, PLLC, No. 18-13336 (Oct. 25, 2018, E.D.MI).  And as mentioned above, Barber was convicted in the Eastern District of New York in connection with the same unlawful scheme. *See U.S. v. Wesley Blake Barber*, *et al.,* No. 19-00239 (E.D.N.Y.).[9]

49.    Based on various discovery documents and pleadings from the Lawsuit, Fountain View knowingly participated with Pribil and Barber in a larger fraud scheme that included the unlawful acts forming the basis of the Lawsuit and of Barber's indictment. Instead of transvaginal mesh patients that were Barber's targets in the criminal case, the Lawsuit describes how Barber and his associates would solicit individuals who were involved in motor vehicle accidents and convince them to undergo surgical procedures they did not need, and then referred those patients for surgery to ISpine, Pribil, Swift, and Fountain View.  ISpine would bill the surgical procedures to insurance providers, while Fountain View would bill the providers for its various facility and equipment fees.  Importantly, in each case, the billed amounts were grossly and falsely inflated using various means described below.  The final step in the fraud was for Barber to arrange for ISpine and Fountain View to sell their respective receivables to third parties, including an entity called Velocity LLC (for which Barber would receive an additional commission).

---

[9] In the criminal case, Barber was charged with soliciting women who had received transvaginal mesh implants, convincing them that they need a surgical procedure to remove the implants, and then referring them to physicians he was associated with (despite having no medical training) to perform the unnecessary surgery.  The indictment

50.     State and federal health care laws universally mandate that health service providers like Fountain View only bill for surgical and other procedures if they were actually performed.  Yet Fountain View routinely submitted bills to insurance providers for medical procedures that were both different from and additional to the procedures included in reports and otherwise billed by the treating or operating physician.  Through pleadings and discovery in the Lawsuit and other litigation, and on information and belief, Fountain View intentionally engaged in at least the following unlawful acts:

    a.   Fountain View billed Allstate for facility and supply charges for a two-level cervical spine surgery performed by ISpine/Pribil on patient R.E. [10] on June 13, 2019.  However, no two-level surgery was ever performed on this patient.  Fountain View knowingly sent false medical records regarding this non-existent procedure to Allstate by U.S. Mail for purposes of receiving payment from Allstate (Claim No. 0528804446).

    b.   Fountain View billed Allstate for facility charges for shoulder surgery supposedly performed by Swift on patient S.M. on March 22, 2018.  However, no such shoulder surgery was ever performed on this patient.  Fountain View knowingly sent a bill for this non-existent procedure to Allstate by U.S. Mail for purposes of receiving payment from Allstate (Claim No. 0431030659).

    c.   Fountain View billed Allstate for facility fees and four pain management injections for a patient with the initials J.F. on September 21, 2018.  The clinician performing the injection, however, performed and billed only a single injection.  As a result, Fountain View billed the provider more than $11,000, comprising $10,000 worth of injections that were never performed. Fountain View knowingly sent a bill for this non-existent

---

states that Barber would receive a kickback for his efforts and would also benefit from later selling and receiving profits from the medical debt that resulted from such surgeries.
[10] Patients will only be identified by initials to protect their privacy rights.

procedure to Allstate by U.S. Mail for purposes of receiving payment from Allstate (Claim No. 0491502597).

    d. Fountain View billed Allstate for facility and supply charges for an acromioplasty supposedly performed by Swift on patient J.N. on June 14, 2018.  No such surgery was ever performed on this patient.  Fountain View knowingly sent a bill for this non-existent procedure to Allstate by U.S. Mail for purposes of receiving payment from Allstate (Claim No. 0487713983).[11]

51.    Further, when billing for facility and supply fees in connection with surgical or other procedures, Fountain View almost always charged multiple times for the same individual procedures.  For example, Fountain View commonly overbilled in this manner for cervical disc replacement surgeries.

52.    The Current Procedural Terminology ("CPT") Codes used by Fountain View to bill for disc replacements (22856 and 22858) expressly include the performance of a discectomy (*i.e.*, removing part or all of an intervertebral disc).  This of course makes sense, since performing a "cervical disc replacement" would necessarily include removing all or part of a disc—*i.e.*, a discectomy.  Fountain View routinely billed for the

---

[11] While not a party to this lawsuit, ISpine participated in numerous fraudulent acts in connection with these billings.  As alleged in the Lawsuit, ISpine billed Allstate nearly $100,000 for allegedly performing a two-level cervical total disc replacement surgery on patient T.Y. (Claim No. 0557411600) on January 22, 2020. The operative report submitted relative to T.Y. claims that Pribil had a nurse practitioner from an entity called Spine & Health PLLC ("Spine & Health") assist with the surgery.  When Allstate contacted Spine & Health to inquire about its alleged treatment, Spine & Health responded stating "[p]atient [T.Y.] does not treat at Spine & Health," thereby confirming that no service was actually performed.

alleged replacement of a cervical disc, but would also inflate the total bill by including charges for discectomy.

53.     Likewise, the use of fluoroscopy and an operating microscope are included in the CPT code for disc replacement surgery/discectomy, and cannot be billed separately and in addition to a disc replacement.  Yet in nearly every case involving a disc replacement or laminectomy, Fountain View improperly "double-dipped" by billing separately for the use of a fluoroscope and microscope.

54.     Indeed, Fountain View routinely submitted improper bills in this fashion, which often resulted in very large dollar amounts.  For instance, Fountain View submitted bills to Allstate for a disc replacement surgery for patient K.E. on October 11, 2018, amounting to more than $260,000.  Nearly $175,000 of that bill was the result of improper double billing for discectomy, fluoroscopy, and microscopy.

55.     Fountain View's fraudulent practice of billing multiple times for services covered within a single procedure code resulted in Fountain View collecting millions of dollars under false and fraudulent pretenses.  In the process of engaging in the fraudulent Scheme, Fountain View violated numerous medical, professional, ethical, and legal standards.  The fraudulent bills submitted by Fountain View to insurance providers like Allstate also constitute mail and/or wire fraud, since Fountain View sent the bills via U.S. mail, wire transfer, or other channels of interstate commerce.

56.     Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a). Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]." Mich. Comp. Laws § 500.3157(1).

57.     Thus, every time Fountain View submitted bills and medical records to Allstate supporting its claims for No-Fault benefits, Fountain View necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

58.     For numerous reasons, Fountain View's alleged services were either not actually performed, not, lawful, and fraudulently billed to insurance providers.

59.     Fountain view routinely billed for surgical procedures that were not performed at all.

60.     Fountain view routinely billed multiple times for the same services.

61.     Fountain View fraudulently unbundled charges to insurance providers for surgical procedures.

62.     Fountain view improperly manipulated medical billing codes for the purpose of inflating the amount it billed to the insurance provider.

63.     Fountain View's participation in the fraudulent enterprise and its failure to abide by applicable standards of care show that the billed services were unnecessary and unlawful.

64.     The examples of Fountain View's billing improprieties described above are representative of Fountain View's operations generally, showing that Fountain View was in constant violation of law, including Michigan's No-Fault Act.

65.     The objective of Fountain View's scheme was to collect no-fault benefits to which Fountain View was not entitled because the services rendered, if at all, were unnecessary, not lawfully rendered, fraudulently billed, and billed at excessive and unreasonable amounts.

66.     Fountain View created, prepared, and submitted false medical documentation to insurance providers through U.S. mail, fax, interstate wires, and/or other similar channels, for which it was reasonably foreseeable to Fountain View that such providers would use the same channels to pay Fountain View for its claims.  These improper and unlawful acts described herein were within the ordinary course of business for Fountain View.

67.     Fountain View, with the direction and with the knowledge of Williams, continued to submit claims for payment to insurance providers.  Due to the improprieties described above, these submissions constituted mail and wire fraud in violation of state and federal law, including the Michigan No-Fault Act, and 18 U.S.C. §§ 1341, 1343.

68.     Every time Fountain View billed Allstate and other providers (including in the examples above), Fountain View used a health insurance claim form approved by the National Uniform Claim Committee.  By submitting this form, Fountain View certified: that the information in the form was true and correct, "that the services shown on [the] form were medically indicated and necessary for the health of the patient and were personally furnished by [Fountain View] or were furnished incident to [Fountain View's] professional service by an employee," and that knowingly filing a form containing misrepresentations or false, incomplete, or misleading information could subject Fountain View to criminal or civil penalties.  By virtue of the billing improprieties described above, Fountain View breached this affirmation upon submitting its bills to Allstate and other providers by misrepresenting the services it billed for.  Plaintiff knew that each bill submitted by Fountain View to Allstate and other providers was subject to this or a similar certification and relied on these representations when deciding whether to enter into the Agreement.

69.     As Fountain View, Williams, and the participants described herein worked in concert to further the unlawful scheme and commit mail and wire fraud, they committed unlawful acts within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Fountain View's damages.

70.     Fountain View's fraudulent scheme resulted in Defendants receiving a financial windfall amounting to millions of dollars.  Williams was aware of and was

actively involved in perpetrating the scheme, and did so precisely to benefit himself and the other Defendants financially, including by performing more procedures, thereby making the ASC more attractive for a potential sale.

**G.    Fountain View Breached the Agreement by Negotiating with other Potential Buyers**

71.    During the course of its investigation, S&J also discovered that Williams (on behalf of Fountain View and the other Defendants) had been discussing Proposals for the ASC from potential buyers, despite the fact that he was restricted from doing so by Section 6.7 of the Agreement.  This conclusion is supported by a January 25, 2021 email regarding delaying the Closing date.  In that email, Williams candidly revealed that he had been engaged "with other buyers who I know could have closed by now."  At no point, however, did Williams or Fountain View ever provide oral and written notice of such buyers to S&J, as is required by Section 6.7.

72.    Indeed, for each such Proposal (or any inquiry that might lead to a Proposal), Section 6.7 of the Agreement required Fountain View to notify S&J, orally and in writing, of the existence of any such Proposal, any request for information with respect to such Proposal, the material terms and conditions of the Proposal (or inquiry, as applicable), and the identity of the individual or entity making same.  Despite effectively acknowledging that it had been negotiating with other potential buyers after executing the Agreement, Fountain View failed to satisfy its disclosure obligations under Section 6.7 of the Agreement.  By breaching Section 6.7, Fountain View improperly solicited and

received a better offer for the ASC, causing Fountain View to lose interest in and ultimately sabotage the transaction.

73.     S&J later discovered that, on March 21—less than 2 weeks after Fountain View purported to terminate the Agreement—Williams filed a Letter of Intent with the State of Michigan, which contemplated a sale of the ASC to UnaSource Surgery Center ("UnaSource")—a competitor of S&J.   On information and belief, Fountain View has since entered into a purchase agreement to sell the ASC to UnaSource at a higher purchase price than was agreed to by the parties here.   This is an abnormally short amount of time to terminate one acquisition agreement and consummate another in connection with a transaction of this size.

## COUNT I – Breach of Contract

74.     S&J re-alleges and incorporates the allegations set forth in the preceding paragraphs.

75.     The parties entered into the Agreement, which was a valid and binding contract.

76.     S&J fully performed its obligations under the Agreement.

77.     In Sections 4.13, Defendants represented and warranted that Fountain View had, at all times, complied with all laws applicable to the operation of the ASC and had at all times complied with all health care laws.

78.    Defendants breached Section 4.13, including by engaging in an unlawful referral/kickback arrangement, billing for services not actually performed, and billing multiple times for a single procedure.  These unlawful acts constitute a fraudulent insurance act and mail and wire fraud in violation of state and federal law, including the Michigan No-Fault Act, and 18 U.S.C. §§ 1341, 1343.

79.    Defendants' misrepresentations were intended to induce S&J to execute the Agreement. Had S&J known that Fountain View was committing fraud and consistently violating applicable law, in breach of Section 4.13, it would never have executed the Agreement.

80.    In Section 6.3, Fountain View agreed not to enter into discussions or negotiations with, or provide any information to, any person or entity in connection with any inquiry, proposal or offer from any such person or entity relating to the direct or indirect disposition of all or any portion of the ASC or its assets.  Fountain View further agreed that, within three business days after receiving a Proposal, a request for information with respect to any Proposal, or any inquiry that could reasonably be expected to result in a Proposal, Fountain View would advise S&J orally and in writing of any such Proposal, request, or inquiry, and inform S&J of (a) the material terms and conditions of, and (b) the identity of the party making, any such Proposal, request, or inquiry.

81.     The parties agreed that Fountain View's non-compliance with the disclosure requirements described above would cause irreparable harm to S&J for which money damages would not provide an adequate remedy.

82.     Fountain View breached Section 6.3 by engaging in discussions with potential buyers other than S&J.  As noted above, Williams even noted in a January 25, 2020 email that he had been communicating with potential buyers that he "knew" could close.  Additionally, S&J discovered that Fountain View was also negotiating with UnaSource in violation of Section 6.3, as supported by the Letter of Intent filed by UnaSource and indicating its intent to acquire Fountain View for a higher price than Plaintiff agreed to pay.  This Letter of Intent was executed two weeks after the termination of the contract with S&J – an abnormally short period of time to end one agreement and enter into another.

83.     Section 6.3 required that Defendants provide oral and written notice to S&J in the event that any contact is made with another potential buyer.  Defendants failed to provide any such notice to Plaintiff.

84.     Among other harms, Fountain View's negotiation with other parties allowed it to secure a higher price after fraudulently inducing S&J to execute the Agreement, thereby costing S&J the Deposits and other expenses paid pursuant to the Amendment.

85.     As a direct and proximate result of Defendants' breaches discussed above, S&J has been damaged in its business and property, and Defendants gained and benefited and will continue to gain and benefit, in an amount to be proven at trial that exceeds $75,000, exclusive of interest and costs.

## COUNT II – Common Law Fraud (As to Williams)

86.     S&J re-alleges and incorporates the allegations set forth in the preceding paragraphs.

87.     As described above, Williams repeatedly told Baydoun, both before and after executing the Agreement, that Fountain View would be settling the Lawsuit prior to Closing and that Baydoun and S&J had "nothing to worry about."

88.     Williams made these misrepresentations and assurances despite knowing full well that Fountain View had no plans to settle the Lawsuit.  In November 2020, Williams falsely assured Baydoun that Fountain View was close to settling the Lawsuit, and that there was no reason for Baydoun to be concerned.

89.     During telephone conversations on January 19, 26, and 28, and on February 12, Williams gave additional false assurances to Baydoun he "had nothing to worry about" regarding the lawsuit, that Fountain View was "very close" to settling it, and that this settlement would take place before the anticipated closing date for the transaction.

90.     Unknown to Baydoun at the time was the fact that Williams was misleading him all along. Despite his assurances, Williams knew that the Lawsuit would

not settle before Closing, and he misrepresented his fact for the specific purpose of inducing S&J to commit to the transaction.

91.     By making these assurances, Williams intended to induce Baydoun into executing the Contract and paying a large sum as a deposit to acquire the ASC. Relying on Williams's assurances that Fountain View would settle the Lawsuit, Baydoun did so. Throughout January and February of 2021 (after the Contract no longer bound the parties), Williams continued to represent to Baydoun that Fountain View would settle the Lawsuit before the Closing, to induce Plaintiff to execute the Amendment and pay additional costs.

92.     In a series of text messages between Baydoun and Williams on February 28, 2021, Baydoun yet again sought assurance from Williams that the Lawsuit would settle, stating: "Good morning. Where are you in the settlement of the RICO [Lawsuit]? Did you get it finalized and dismissed yet or are they waiting on payment of some sort."

93.     In his response, Williams indicated for the first time that the Lawsuit would not settle before the anticipated Closing date of March 5, 2021, stating: 'The case is ongoing, will be so for some time and we feel very good about its direction."

94.     Williams further asserted that he would not agree to set aside any dollar amount in escrow for the Lawsuit, going so far as to suggest that there was no possibility of liability for Fountain View: "I will not agree to a holdback for a liability that doesn't

exist." Williams was wrong, of course. The case remains pending, meaning that there is indeed a liability risk.

95.     Williams's response was completely at odds with his efforts over the previous months to downplay and minimize the Lawsuit, stating numerous times to Baydoun that it should not concern him.

96.     On March 6, Baydoun followed up with Williams by asking: "Is your plan to settle the [Lawsuit] out or drag it out through the courts?" Williams replied by asserting that he had "[no] plan to give in to a baseless lawsuit." Finally, Williams again misrepresented to Baydoun that he had "nothing to worry about." This was simply wrong—as S&J would later learn, the very same scheme described in the Lawsuit had already led to a criminal conviction of one of the individuals involved.

97.     Williams completely changed his representations about the Lawsuit, first stating unequivocally that the Lawsuit would settle, only to later backtrack and admit that it would not settle before Closing, but that the Lawsuit had no potential for liability and that Baydoun need not concern himself with it.  Williams knew that these representations were false because, as discussed below, he was well aware that Fountain View had been engaging for years in an unlawful scheme involving fraudulent billing, unlawful solicitation of patients, and kick-backs.

98.     Williams knowingly made these misrepresentations for purposes of inducing S&J to execute the Agreement and pay the Deposit and other costs and to

continue to obligate S&J to perform under the Agreement while Fountain View improperly solicited and eventually received additional offers for the ASC. Williams misled S&J, knowing that it would be a problem for S&J if the Lawsuit remained pending at Closing, and that if S&J did not close, then Fountain View could purportedly terminate the Agreement and keep the deposit and certain other costs paid by S&J.

99.     In sum, Williams' deception was two-fold. He first misrepresented facts to induce Plaintiff to execute the Agreement and pay the initial deposit. Williams then continued misrepresenting facts after December 31, 2020 (when the parties were no longer bound by the Agreement) as a means of inducing Plaintiff to continue negotiations and eventually proceed to the Closing. Williams continued making false assurances to Plaintiff that the Lawsuit was on the verge of settling, this time to induce Plaintiff to execute the Amendment, pay the non-refundable Additional Deposit and Fountain View's expenses.

100.     S&J reasonably relied on Williams' material misrepresentations to its detriment in deciding to execute the Agreement and pay deposits and other expenses to Defendants. Had S&J known that Fountain View had no intention or plan to settle the Lawsuit, S&J would never have entered into the Agreement, or paid any Deposit or other expenses to Fountain View.

101.     As a direct and proximate result of Williams' breaches discussed above, S&J has been damaged in its business and property, and Defendants gained and benefited

and will continue to gain and benefit, in an amount to be proven at trial that exceeds $75,000, exclusive of interest and costs.

## COUNT III – Common Law Fraud

102.   S&J re-alleges and incorporates the allegations set forth in the preceding paragraphs.

103.   The fraudulent scheme described above was dependent on a succession of material misrepresentations of fact (or an omission of a material fact) that Fountain View was lawfully and actually providing necessary services in compliance with the Michigan No-Fault Act and was entitled to collect benefits.

104.   Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

105.   The misrepresentations were made by Defendants in furtherance of their scheme to defraud a potential buyer like Fountain View by submitting, causing to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault act would be submitted to insurance providers, thereby artificially and improperly increasing the ASC's productivity, including the number of procedures performed, thus making the ASC much more attractive to a potential buyer.

106.   Defendants made these representations knowingly and to induce S&J into executing the Agreement.

107.   S&J reasonably relied upon such material misrepresentations to its detriment in deciding to execute the Agreement and pay deposits and other expenses to Defendants.   Had S&J known about the misrepresentations or billing improprieties discussed above, S&J would never have entered into the Agreement.

108.   As a direct and proximate result of Defendants' breaches discussed above, S&J has been damaged in its business and property, and Defendants gained and benefited and will continue to gain and benefit, in an amount to be proven at trial that exceeds $75,000, exclusive of interest and costs.

### COUNT IV – Fraudulent Inducement
### (based on representations and warranties in the Agreement

109.   S&J re-alleges and incorporates the allegations set forth in the preceding paragraphs.

110.   Defendants were all signatories of the Agreement.

111.   The Agreement contained various representations and warranties.

112.   To induce S&J's execution of the Agreement, Defendants specifically included a contractual representation and warranty affirming that Fountain View was in full compliance with all laws applicable to the operation of the ASC and had at all times complied with all health care laws. Defendants knew this representation was false at the time Williams made it, because they were actively engaged in the fraudulent billing and kickback scheme described here.

113. S&J reasonably relied upon such material misrepresentations to its detriment in deciding to execute the Agreement and pay deposits and other expenses to Defendants. Had S&J known about the misrepresentations or billing improprieties discussed above, S&J would never have entered into the Agreement.

114. As a direct and proximate result of Defendants' breaches discussed above, S&J has been damaged in its business and property, and Defendants gained and benefited and will continue to gain and benefit, in an amount to be proven at trial that exceeds $75,000, exclusive of interest and costs.

## COUNT IV – Violation of 18 U.S.C. § 1962(c)

115. S&J re-alleges and incorporates the allegations set forth in the preceding paragraphs.

116. This Count is against Fountain View.

117. ISpine, Pribil, and Barber comprise an enterprise engaged in and whose activities affect interstate commerce, as defined in 18 U.S.C. § 1961(4). Fountain View is employed by or associated with the enterprise.

118. S&J sought to purchase the ASC from Fountain View. Unbeknownst to S&J at that time, however, was that Defendants were using the ASC as the home base for their fraudulent billing and kickback scheme that serves as the racketeering activity here.

119. Fountain View furthered the fraudulent scheme using the ASC, including by supplying the facility and equipment for the surgical procedures at the heart of the

scheme. Had S&J known the true nature of Fountain View's activities using the ASC, it never would have entered into the Agreement to acquire the ASC, and thus would not have suffered more than $500,000 in damages.

120.   Despite knowing that S&J was pursuing the facility at the heart of Defendants' RICO activities, Fountain View concealed the true nature of the ASC to cover their tracks, in furtherance of the fraudulent scheme.  Fountain View and the other Defendants knew that S&J would not want to acquire the ASC if it knew about the fraud taking place there.  Fountain View's concealment of the misuse of the ASC was a necessary act that furthered the predicate racketeering scheme.

121.   Knowing that S&J was spending time and money in pursuit of the ASC, Fountain View had a duty to disclose the fraudulent activities taking place at the ASC, but failed to do so.  But for Fountain View's concealment of the fraudulent racketeering scheme, S&J would never have pursued the acquisition and thus would not have suffered injury.

122.   Fountain View's concealing or covering up of the predicate acts – the fraudulent billing and kickback scheme – was significant in that it created a façade of legitimacy for the ASC.  It was foreseeable that this outward appearance would be a significant factor to a potential acquirer of the ASC, like S&J.  Further, a potential sale of the ASC was itself a foreseeable event, given that Williams has bought and sold similar centers before.

123. Indeed, Fountain View agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. This includes using U.S. mail, wires, or other channels of interstate commerce to commit mail/wire fraud by sending false or fraudulent bills and other documents to insurance providers such as Allstate. Fountain View did so in coordination with the enterprise and with full knowledge that the bills and other documents were false or fraudulent.

124. The acts described in this complaint constitute a pattern of racketeering activity pursuant to 18 U.S.C. 1961(5).

125. Fountain View has directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

126. Pursuant to and in furtherance of the fraudulent scheme, Fountain View committed multiple related acts. Specifically, and without limitation, Fountain View provided ISpine with the facility and supplies for the surgical and other procedures forming the basis of the fraudulent scheme took place (or were alleged to have taken place); coordinated with the enterprise to bill insurance providers for false or fraudulent charges; and provided improper kickbacks to Barber in exchange for directing victims to the enterprise.

127.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.   For example, Plaintiffs relied on Fountain View's representations that its billing and other practices were in compliance with law in deciding to execute the Agreement and pay the Deposit and other costs to Fountain View.  Fountain View had a duty to disclose the fact that it was transmitting false or fraudulent documents to insurance providers like Allstate through US mail and other channels of interstate commerce.

## COUNT V – Violation of 18 U.S.C. § 1962(d)

128.    S&J re-alleges and incorporates the allegations set forth in the preceding paragraphs.

129.    This Count is against Fountain View and Williams.

130.    ISpine constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in activities that affect interstate commerce.

131.    Pribil and Barber owned and managed ISpine and were responsible for all actions taken by ISpine and its employees and representatives.

132.    Fountain View and Williams provided ISpine with facilities to bill for false, fraudulent, and/or medically unnecessary procedures.

133.    Further, Fountain View and Williams, together with the enterprise described above engaged in a pattern of racketeering activity by causing to be prepared,

faxed, and mailed false medical documentation by ISpine, or knew that such false medical documentation would be faxed and mailed in the ordinary course of ISpine's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by ISpine would occur, in furtherance of the fraudulent scheme.

134.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered by or in conjunction with Fountain View to Allstate through the U.S. Mail and/or interstate wires.

135.   Barber, Pribil, and ISpine were aware of the fraudulent scheme, and were involved in other instances of it in other states.  Barber, Pribil, and ISpine were also aware that the no-fault patients at issue in the Lawsuit and in this case were unlawfully solicited by Barber and referred to ISpine and Pribil, and that the surgeries and other procedures these patients received would be fraudulently and falsely billed by Fountain View to insurance providers like Allstate in the manner described above.

136.   Fountain View and Williams were aware of the fraudulent scheme and the fact that the enterprise engaged in a similar scheme in other states.  Fountain View and Williams knew that providing a facility and supplies for the surgeries or alleged surgeries would contribute to the fraudulent scheme at issue in this case.  They also knew or should have foreseen that faxes and mailings would be sent to demand and receive payment from insurance providers on certain dates.

137.   Payments from Allstate, based on these false or fraudulent transmissions, were transmitted through the U.S. Mail.

138.   By providing a facility and supplies, and by faxing and mailing, or agreeing that the interstate wires or the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, Fountain View and Williams engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).  As a result of this scheme, Fountain View was able to inflate its billing, number of procedures, and receivables, giving Fountain View the appearance of a legitimate, thriving, and successful business, thereby inducing S&J into entering into the Agreement.

139.   S&J only became interested in purchasing the ASC because of its appearance as a legitimate entity.  Fountain View and Williams were aware of these improprieties and knew they were material to S&J's decision regarding whether to acquire Fountain View, yet intentionally omitted these material facts with the intent of inducing, and did induce, S&J to enter into the Agreement and pay Fountain View a $475,000 deposit and other costs.

140.   Fountain View's and Williams' unlawful conduct in violation of 18 U.S.C. § 1962(d) was the direct and proximate cause of S&J's injury.  If S&J were aware of the fraudulent scheme described herein, it would have never entered into the Agreement or paid any amount of money to Fountain View.  Because of these unlawful activities, S&J

is entitled to recover three times the damages it sustained as well as attorney's fees and costs involved with bringing this action.

## IV. REQUEST FOR RELIEF

WHEREFORE, S&J respectfully requests that the Court:

A.  AWARD S&J its actual and consequential damages in an amount to be determined at trial;

B.  AWARD S&J treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

C.  GRANT S&J injunctive relief enjoining the defendants from: engaging in the wrongful conduct alleged in the Complaint, pursuing a subsequent transaction involving the ASC and a different buyer, and using of the proceeds of the wrongful conduct described herein; and

D.  GRANT S&J such other and further relief as the Court deems just and proper.

Respectfully submitted,

Honigman LLP

By:   /s/Mohamed M. Awan
      Mohamed M. Awan (P77402)
      660 Woodward Avenue
      2290 First National Building
      Detroit, MI  48226-3506
      (313) 465-7000
      mawan@honigman.com
      *Attorneys for Plaintiff*

Dated: March 1, 2022

# Exhibit A

*Execution Version*

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>"), dated as of December 9, 2020, is entered into between Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center, a Michigan limited liability company ("<u>Seller</u>"), and the equity owners of Seller: Medical Continuum Management, LLC, Atlas Orthopedics, PLLC, Makino Investments, L.L.C., Robert D. Swift, D.O., David W. Williams, Jeffrey J. Carroll, D.O., Mark L. Goldberger, D.O., (who together with Seller are collectively referred to as, the "<u>Seller Parties</u>" and each, a "<u>Seller Party</u>") and Spine & Joint Surgical Institute of Michigan Southfield LLC, a Michigan limited liability company ("<u>Buyer</u>").

## RECITALS

WHEREAS, Seller owns and operates a freestanding outpatient surgical facility certified for participation in Medicare as an ambulatory surgery center (the "<u>ASC</u>") at 29110 Inkster Rd, Southfield, MI 48034; and

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets, and certain specified liabilities, of the ASC, subject to the terms and conditions set forth herein; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## <u>DEFINITIONS</u>

The following terms have the meanings specified or referred to in this Article I:

"<u>Accounts Receivable</u>" has the meaning set forth in Section 2.2(b).

"<u>Acquisition Proposal</u>" has the meaning set forth in Section 6.3(a).

"<u>Action</u>" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"<u>Additional Deposit</u>" has the meaning set forth in Section 9.1(c)(ii).

"<u>Affiliate</u>" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Allocation Schedule</u>" has the meaning set forth in Section 2.6.

"<u>Ancillary Documents</u>" means the Bill of Sale, the Assignment and Assumption Agreement and the other agreements, instruments and documents required to be delivered at the Closing.

"<u>ASC</u>" has the meaning set forth in the recitals.

"<u>Assigned Contracts</u>" has the meaning set forth in Section 2.1(b).

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in Section 3.2(a)(ii).

"<u>Assignment and Assumption of Lease</u>" means an assignment and assumption of lease under which Buyer assumes the lease on the Leased Real Property and which contains a full release of any pre-Closing guarantor of the Lease, each as of the Closing.

"<u>Assumed Liabilities</u>" has the meaning set forth in Section 2.3.

"<u>Basket</u>" has the meaning set forth in Section 8.4(a).

"<u>Benefit Plan</u>" has the meaning set forth in Section 4.15(a).

"<u>Bill of Sale</u>" has the meaning set forth in Section 3.2(a)(i).

"<u>Books and Records</u>" has the meaning set forth in Section 2.1(k).

"<u>Business Day</u>" means any day except Saturday, Sunday or any other day on which commercial banks located in Detroit, Michigan are authorized or required by Law to be closed for business.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"<u>Buyer Closing Certificate</u>" has the meaning set forth in Section 7.3(f).

"<u>Buyer Indemnitees</u>" has the meaning set forth in Section 8.2.

"<u>Cap</u>" has the meaning set forth in Section 8.4(a).

"<u>CARES Act</u>" means the Coronavirus Aid, Relief, and Economic Security Act, as in effect as of the date of this Agreement (or any amended or successor version that is substantively comparable) and any current or future regulations or official interpretations thereof.

"<u>Closing</u>" has the meaning set forth in Section 3.1.

"<u>Closing Date</u>" has the meaning set forth in Section 3.1.

"<u>CMS</u>" has the meaning set forth in Section 6.10(a).

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Contracts</u>" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"<u>Deposit</u>" has the meaning set forth in Section 2.5.

"<u>Direct Claim</u>" has the meaning set forth in Section 8.5(c).

"<u>Disclosure Schedules</u>" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"<u>Dollars</u>" or "<u>$</u>"  means the lawful currency of the United States.

"<u>Encumbrance</u>" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"<u>Environmental Claim</u>" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law.

"<u>Environmental Law</u>" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

*Execution Version*

"Environmental Notice" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.2(d).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Government Receivables Account" has the meaning set forth in Section 6.10(b).

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Hazardous Materials" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"Health Care Laws" means all Laws relating to the regulation of the health care industry, the provision of health care services and to the payment for any such items or services rendered, provided, dispensed or furnished by health care providers, including, without limitation: (a) all federal and state self-referral prohibitions, anti-kickback, illegal remuneration, fee-splitting, fraud and abuse and provider conflict-of-interest Laws; (b) all Laws governing, regulating or pertaining to the payment for health care related items and services; (c) HIPAA and all other Laws relating to the security, confidentiality and privacy or patients of the ASC; (d) all Laws relating to the generation, transportation, treatment, storage, disposal and other handling of medical waste; and (e) all state, medical, and general health care Laws (including Laws, rules and regulations regarding entity and individual professional licensure and conduct, the corporate practice of medicine, fee-splitting and advertising or marketing of health care services).

"HIPAA" means, collectively, the Health Insurance Portability and Accountability Act of 1996, as amended, and all rules and regulations promulgated under the Health Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act.

*Execution Version*

"Indemnified Party" has the meaning set forth in Section 8.5.

"Indemnifying Party" has the meaning set forth in Section 8.5.

"Insurance Policies" has the meaning set forth in Section 4.11.

"Intellectual Property" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing ("Trademarks"); (b) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("Copyrights"); (c) internet domain names and social media account or user names, whether or not Trademarks, all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto, whether or not Copyrights; (d) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information and all rights therein; (e) computer programs, operating systems, applications, firmware and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof ("Software"); (f) all other intellectual or industrial property and proprietary rights.

"Intellectual Property Assets" means all Intellectual Property owned by Seller and used or held for use in the operation of the ASC as currently conducted.

"Interim Medicare Billing Period" has the meaning set forth in Section 6.10(a).

"Inventory" has the meaning set forth in Section 2.1(a).

"IT Systems" means all Software, computer hardware, servers, networks, platforms, peripherals, and similar or related items of automated, computerized, or other information technology (IT) networks and systems (including telecommunications networks and systems for voice, data, and video) owned, leased, licensed or used (including through cloud-based or other third-party service providers) in the operation of the ASC.

"Knowledge of the Seller Parties" or "the Seller Parties' Knowledge" or any other similar knowledge qualification, means the actual or constructive knowledge of any Seller Parties, after due inquiry.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"Leased Real Property" has the meaning set forth in Section 4.7(a).

"Leases" has the meaning set forth in Section 4.7(a).

"Lease Termination" means the a lease termination under which the Lease is terminated and the pre-Closing guarantors of the Lease are fully released.

"Liabilities" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"Losses" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; provided, however, that "Losses" shall not include punitive damages, except to the extent actually awarded to a Governmental Authority or other third party.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of Seller or the ASC, (b) the value of the Purchased Assets, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the health care industry; (iii) any changes in financial or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement, except pursuant to Section 4.2 and Section 6.8; (vi) any changes in applicable Laws or accounting rules; (vii) the public announcement, pendency or completion of the transactions contemplated by this Agreement or (viii) pandemic; provided further, however, that any event, occurrence, fact, condition or change referred to in clauses (i) through (iv) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition or change has a disproportionate effect on the operation of the ASC compared to other participants in the health care industry.

"Material Contracts" has the meaning set forth in Section 4.4(a).

"Material Payors" has the meaning set forth in Section 4.10.

"Medicare Provider Number" has the meaning set forth in Section 6.10(a).

"Permits" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"Permitted Purposes" means the "Allowable Uses of Covered Loans" set forth in Section 7(a)(36)(F) of the Small Business Act, as in effect on the date hereof.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"<u>PPP Escrow Agreement</u>" means that certain escrow agreement between Seller and PPP Lender, dated as of the Closing Date, in connection with the PPP Loan.

"<u>PPP Lender</u>" means TCF Bank.

"<u>PPP Loan</u>" means all indebtedness of Seller under the PPP Loan Documents, in an aggregate principal amount not to exceed $185,000.

"<u>PPP Loan Documents</u>" means that certain loan agreement dated as of May, 2020, by and between Seller and the PPP Lender, and each other agreement or document delivered in connection therewith from time to time.

"<u>Pre-Closing Tax Period</u>" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"<u>Purchase Price</u>" has the meaning set forth in Section 2.5.

"<u>Purchased Assets</u>" has the meaning set forth in Section 2.1.

"<u>Real Estate Transaction</u>" has the meaning set forth in Section 7.1(c).

"<u>Release</u>" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"<u>Representative</u>" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"<u>SBA</u>" means the U.S. Small Business Administration.

"<u>Seller</u>" has the meaning set forth in the preamble.

"<u>Seller Closing Certificate</u>" has the meaning set forth in Section 7.2(j).

"<u>Seller Parties</u>" has the meaning set forth in the preamble.

"<u>Seller Party Indemnitees</u>" has the meaning set forth in Section 8.3.

"<u>Small Business Act</u>" means the Small Business Act (15 U.S.C. 636(a)) after giving effect to the implementation of the CARES Act, as in effect of the date of this Agreement (or any amended or successor version that is substantively comparable) and any current or future regulations or official interpretations thereof.

"<u>Software</u>" has the meaning set forth in the definition of Intellectual Property.

"<u>Tangible Personal Property</u>" has the meaning set forth in Section 2.1(e).

*Execution Version*

"Tax Clearance Certificate" has the meaning set forth in Section 6.17.

"Taxes" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Return" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third-Party Claim" has the meaning set forth in Section 8.5(a).

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1   Purchase and Sale of Assets. Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of any Encumbrances, all of Seller's right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the ASC (collectively, the "Purchased Assets"), including, without limitation, the following:

(a)     all inventory and medical and office supplies used by Seller at the ASC ("Inventory");

(b)     all Contracts set forth on Section 2.1(b) of the Disclosure Schedules (the "Assigned Contracts");

(c)     all Intellectual Property Assets;

(d)     all telephone and fax numbers used by Seller with respect to the ASC, including but not limited to (248) 234-9300 and (248) 234-9301;

(e)     all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property (the "Tangible Personal Property");

(f)     all Leased Real Property used in connection with the ASC;

(g)      to the extent transferable and desired by Buyer, all Permits which are held by Seller and required for the operation of the ASC as currently conducted or for the ownership and use of the Purchased Assets, including, without limitation, those listed on Section 4.13(b) of the Disclosure Schedules;

(h)      all rights to any Actions of any nature available to or being pursued by either Seller to the extent related to the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

(i)      all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(j)      all insurance benefits, including rights and proceeds, arising from or relating to the ASC, the Purchased Assets or the Assumed Liabilities;

(k)      originals, or where not available, copies, of all books and records, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, patient lists, price lists, supplier lists, customer complaints and inquiry files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Intellectual Property Assets and all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts, whether written or oral, relating to any Intellectual Property that is used or held for use in the operation of the ASC as currently operated to which Seller is a party, beneficiary or otherwise bound (collectively, "Books and Records"); and

(l)      all goodwill and the going concern value of the ASC.

Section 2.2      Excluded Assets. Notwithstanding the foregoing, the Purchased Assets shall not include the following assets (collectively, the "Excluded Assets"):

(a)      all cash and cash equivalents of the Seller Parties;

(b)      all accounts or notes receivable of the Seller Parties, and any security, claim, remedy or other right related to any of the foregoing ("Accounts Receivable");

(c)      all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes);

(d)      any Contracts that are not Assigned Contracts (the "Excluded Contracts");

(e)      the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller;

(f)      all Benefit Plans and assets attributable thereto;

(g)      the assets, properties and rights specifically set forth on Section 2.2(g) of the Disclosure Schedules; and

(h)      the rights which accrue or will accrue to the Seller Parties under this Agreement and the Ancillary Documents.

Section 2.3      <u>Assumed Liabilities</u>. Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the Liabilities of Seller in respect of the Assigned Contracts required to be performed after the Closing Date that were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by either Seller on or prior to the Closing (collectively, the "<u>Assumed Liabilities</u>") and no other Liabilities.

Section 2.4      <u>Excluded Liabilities</u>. Notwithstanding the provisions of Section 2.3 or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its respective Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "<u>Excluded Liabilities</u>"). Seller shall, and shall cause each of their respective Affiliates to, pay and satisfy in due course all Excluded Liabilities which they are obligated to pay and satisfy. Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)      any Liabilities of any Seller Party arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)      any Liability for: (i) Taxes of any Seller Party or its Affiliate(s) relating to the ASC, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; (ii) Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of any Seller Party pursuant to Section 6.16; or (iii) other Taxes of any Seller Party or its Affiliate(s) of any kind or description (including any Liability for Taxes of any Seller Party or its Affiliate(s) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

(c)      any Liabilities relating to or arising out of the Excluded Assets;

(d)      any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the ASC or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date, including but not limited to Allstate Insurance Company et al. v. Ispine, PLLC, 20-cv-12008-LVP-EAS;

(e)      any Liabilities of Seller arising under or in connection with any Benefit Plan providing benefits to any present or former employee of Seller;

(f)       any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(g)       any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(h)       any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same), except for indemnification of same pursuant to Section 8.3 as Seller Party Indemnitees;

(i)       any Liabilities under the Excluded Contracts or any other Contracts: (i) which are not validly and effectively assigned to Buyer pursuant to this Agreement; (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement; or (iii) to the extent such Liabilities arise out of or relate to a breach by Seller of such Contracts prior to Closing;

(j)       any Liabilities associated with debt, loans or credit facilities of Seller and/or the ASC to financial institutions, including the PPP Loan;

(k)       any Liabilities arising out of, in respect of or in connection with the failure by any Seller Party or its Affiliate(s) to comply with any Law or Governmental Order; and

(l)       any patient records of Seller.

Section 2.5    Purchase Price. The aggregate purchase price for the Purchased Assets shall be $4,500,000 (the "Purchase Price"), plus the assumption of the Assumed Liabilities. The parties acknowledge that Buyer has paid deposits of $200,000 (collectively the "Deposit") that shall be credited toward the Purchase Price. The balance of the Purchase Price shall be paid as provided in Section 3.2(b)(i).

Section 2.6    Allocation of Purchase Price. Seller and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) as shown on the allocation schedule included in Exhibit A, (the "Allocation Schedule") which shall be completed prior to Closing. Seller and Buyer shall negotiate in good faith the contents of Exhibit A. Buyer and Seller shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule.

Section 2.7    Withholding Tax. Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Law relating to Taxes. All such withheld amounts shall be treated as delivered to Seller hereunder.

Section 2.8    <u>Third-Party Consents</u>. To the extent that Seller's rights under any Contract or Permit constituting a Purchased Asset, or any other Purchased Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer. Notwithstanding any provision in this Section 2.8 to the contrary, Buyer shall not be deemed to have waived its rights under Section 7.2(d) hereof unless and until Buyer either provides written waivers thereof or elects to proceed to consummate the transactions contemplated by this Agreement at Closing.

# ARTICLE III
# CLOSING

Section 3.1    <u>Closing</u>. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place remotely by exchange of documents and signatures (or their electronic counterparts), on the later of: (a) December 31, 2020; and (b) the Business Day after all of the conditions to Closing set forth in Article VII are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as the Seller Parties and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "<u>Closing Date</u>".

Section 3.2    <u>Closing Deliverables.</u>

(a)    At the Closing, the Seller Parties shall deliver to Buyer the following:

(i)    a bill of sale in form and substance satisfactory to the parties (the "<u>Bill of Sale</u>") and duly executed by Seller, transferring the Purchased Assets to Buyer;

(ii)    an assignment and assumption agreement in form and substance satisfactory to parties (the "<u>Assignment and Assumption Agreement</u>") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets owned by Seller and the Assumed Liabilities in Seller's name;

(iii)    the Seller Closing Certificate;

(iv)    the certificate of the Secretary or Assistant Secretary of Seller required by Section 7.2(k);

(v)    a Lease Termination or Assignment and Assumption of Lease, duly executed by Seller, if required under Section 7.1(c); and

(vi)     such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)     At the Closing, Buyer shall deliver to Seller Parties the following:

(i)     the balance of the Purchase Price (taking into account the payment of the Deposit and the Additional Deposit (if applicable) by Buyer) by wire transfer of immediately available funds to an account or accounts designated in writing by the Seller Parties to Buyer;

(ii)     the Assignment and Assumption Agreement duly executed by Buyer;

(iii)    the Buyer Closing Certificate;

(iv)    a Lease Termination or Assignment and Assumption of Lease, duly executed by Buyer, if required under Section 7.1(c); and

(v)     the certificate of the Secretary or Assistant Secretary of Buyer required by Section 7.3(g).

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER PARTIES**

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, each Seller Party represents and warrants to Buyer that the statements contained in this Article IV are true and correct as of the date hereof.

Section 4.1     <u>Organization and Authority of Seller</u>. Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Michigan and has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as currently conducted. Medical Continuum Management, LLC, Atlas Orthopedics, PLLC, Makino Investments, L.L.C., and Robert D. Swift, D.O are the only equity owners of Seller. Seller has full limited liability company power and authority, and each Seller Party has full individual power and authority, to enter into this Agreement and the Ancillary Documents to which such Seller Party is a party, to carry out its respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any Ancillary Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of Seller. This Agreement has been duly executed and delivered by each Seller Party, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of each Seller Party, enforceable against such Seller Party in accordance with its terms. When each Ancillary Document to which a Seller Party is or will be a party has been duly executed and delivered by such Seller Party (assuming due authorization, execution and

delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of such Seller Party enforceable against such Seller Party in accordance with its terms.

Section 4.2    No Conflicts; Consents. The execution, delivery and performance by the Seller Parties of this Agreement and the Ancillary Documents to which each is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the articles of organization, operating agreement or other organizational documents of any Seller Party that is not an individual; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to either Seller, the ASC, any Seller Party or the Purchased Assets; (c) except as set forth in Section 4.2 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which any Seller Party is a party or by which any Seller Party or the ASC is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to any Seller Party in connection with the execution and delivery of this Agreement or any of the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

Section 4.3    Undisclosed Liabilities. Seller has no Liabilities with respect to the ASC, except: (a) those liabilities of set forth on Section 4.3 of the Disclosure Schedules; and (b) those liabilities of Seller which have been incurred in the ordinary course of business consistent with past practice.

Section 4.4    Material Contracts.

(a)    Section 4.4 of the Disclosure Schedules lists each of the following Contracts: (x) by which any of the Purchased Assets are bound or affected; or (y) to which Seller is a party or by which it is bound in connection with its business or the Purchased Assets (the "Material Contracts"):

(i)    all Contracts involving aggregate consideration in excess of $5,000 and which, in each case, cannot be cancelled without penalty or without more than 90 days' notice;

(ii)    all Contracts that provide for the indemnification of any Person or the assumption of any Tax, environmental or other Liability of any Person;

(iii)    all Contracts that relate to the acquisition or disposition of any business, a material amount of stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(iv)    all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts;

*Execution Version*

(v)     all employment agreements and Contracts with independent contractors or consultants (or similar arrangements) and which are not cancellable without material penalty or without more than 90 days' notice;

(vi)     all Contracts relating to indebtedness (including, without limitation, guarantees);

(vii)     all Contracts with any third-party payors, including commercial and governmental payors;

(viii)     all Contracts that limit or purport to limit the ability of Seller to compete in any line of business or with any Person or in any geographic area or during any period of time;

(ix)     all joint venture, partnership or similar Contracts;

(x)     all Contracts for the sale of any of the Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets;

(xi)     all powers of attorney with respect to the ASC or any Purchased Asset; and

(xii)     all other Contracts that are material to the Purchased Assets or the operation of the ASC and not previously disclosed pursuant to this Section 4.4.

(b)     Each Material Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. None of either Seller or, to any Seller Party's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate, any Material Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer. There are no material disputes pending or threatened under any Contract included in the Purchased Assets.

Section 4.5     <u>Title to Purchased Assets</u>. Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets owned by Seller. There are no assets used in the operation of the ASC other than the Purchased Assets or Excluded Assets. All such Purchased Assets (including leasehold interests) are free and clear of Encumbrances.

Section 4.6     <u>Condition and Sufficiency of Assets</u>. The Leased Real Property, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property included in the Purchased Assets are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such Leased Real Property, furniture,

fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The Purchased Assets are sufficient for the continued operation of the ASC after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to operate the ASC as currently conducted. None of the Excluded Assets are material to the operation of the ASC.

Section 4.7    <u>Leased Real Property</u>.

(a)    Section 4.7 of the Disclosure Schedules sets forth each parcel of real property leased by Seller and used in or necessary for the conduct of Seller's business as currently conducted (together with all rights, title and interest of Seller in and to leasehold improvements relating thereto, including, but not limited to, security deposits, reserves or prepaid rents paid in connection therewith, collectively, the "<u>Leased Real Property</u>"), and a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds any Leased Real Property (collectively, the "<u>Leases</u>"). Seller has delivered to Buyer a true and complete copy of each Lease. With respect to each Lease:

(i)    such Lease is valid, binding, enforceable and in full force and effect, and Seller enjoys peaceful and undisturbed possession of the Leased Real Property;

(ii)    Seller is not in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or default, and Seller has paid all rent due and payable under such Lease;

(iii)    No Seller Party has received nor given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by Seller under any of the Leases and, to the Knowledge of each Seller Party, no other party is in default thereof, and no party to any Lease has exercised any termination rights with respect thereto;

(iv)    Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; and

(v)    Seller has not pledged, mortgaged or otherwise granted an Encumbrance on its leasehold interest in any Leased Real Property.

(b)    No Seller Party has received any written notice of: (i) material violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Leased Real Property; (ii) existing, pending or threatened condemnation proceedings affecting the Leased Real Property; or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to materially and adversely affect the ability to operate the Leased Real Property as currently operated. Neither the whole nor any material portion of any Leased Real Property has been damaged or destroyed by fire or other casualty.

(c)      The Leased Real Property is sufficient for the continued operation of the ASC after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of the real property necessary to operate the ASC as currently operated.

Section 4.8      Intellectual Property.

(a)      Seller is the sole and exclusive legal and beneficial owner of all right, title and interest in and to the Intellectual Property Assets and has the valid and enforceable right to use all other Intellectual Property used in or necessary for the operation of the ASC as currently conducted, in each case, free and clear of Encumbrances. The Intellectual Property Assets are all of the Intellectual Property necessary to operate the ASC as presently conducted. Neither the execution, delivery or performance of this Agreement, nor the consummation of the transactions contemplated hereunder, will result in the loss or impairment of or payment of any additional amounts with respect to, or require the consent of any other Person in respect of, Buyer's right to own or use any Intellectual Property Assets in the operation of the ASC as currently operated. Immediately following the Closing, all Intellectual Property Assets will be owned or available for use by Buyer on identical terms as they were owned or available for use by Seller immediately prior to the Closing.

(b)      All of Seller's IT Systems are in good working condition and are sufficient for the operation of the ASC as currently operated. In the past year, there has been no malfunction, failure, continued substandard performance, denial-of-service, or other cyber incident, including any cyberattack, or other impairment of Seller's IT Systems that has resulted or is reasonably likely to result in material disruption or damage to the operations of the ASC. Seller has taken all commercially reasonable steps to safeguard the confidentiality, availability, security and integrity of the IT Systems, including implementing and maintaining appropriate backup, disaster recovery and Software and hardware support arrangements.

(c)      Seller have complied with all applicable Laws and all publicly posted policies, notices and statements concerning the collection, use, processing, storage, transfer and security of personal information, including protected health information (as defined under HIPAA), in the operation of the ASC. In the past year, Seller has not: (i) experienced any actual, alleged, or suspected data breach or other security incident involving personal information in its possession or control; or (ii) received any notice of any audit, investigation, complaint or other Action by any Governmental Authority or other Person concerning Seller's collection, use, processing, storage, transfer or protection of personal information, including, in the case of Seller, protected health information (as defined under HIPAA), or actual, alleged or suspected violation of any applicable Law concerning privacy, data security or data breach notification, in each case in connection with the operation of the ASC, and to each Seller Party's Knowledge, there are no facts or circumstances that could reasonably be expected to give rise to any such Action.

Section 4.9      Inventory. All Inventory consists of a quality and quantity usable and salable in the ordinary course of business consistent with past practice, except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market

value or for which adequate reserves have been established. All Inventory is owned by Seller free and clear of all Encumbrances, and no Inventory is held on a consignment basis. The quantities of each item of Inventory are not excessive, but are reasonable in the present circumstances of the ASC.

Section 4.10    Third-Party Payors. Section 4.10 of the Disclosure Schedules sets forth with respect to the operation of the ASC: (a) each third-party payor (including commercial and governmental payors) who has paid aggregate consideration to Seller for medical services rendered in an amount greater than or equal to $25,000 for each of the two most recent fiscal years (collectively, the "Material Payors"); and (b) the amount of consideration paid by each Material Payor during such periods. Seller has not received any notice, and has no reason to believe, that any of the Material Payors has ceased, or intends to cease after the Closing, to reimburse for the ambulatory surgery center services of Seller or to otherwise terminate or materially reduce its relationship with Seller.

Section 4.11    Insurance. Section 4.11 of the Disclosure Schedules sets forth: (a) a true and complete list of all current policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance maintained by Seller and relating to the ASC, the Purchased Assets or the Assumed Liabilities (collectively, the "Insurance Policies"); and (b) with respect to the ASC, the Purchased Assets or the Assumed Liabilities, a list of all pending claims and the claims history for Seller since January 1, 2019. Except as set forth on Section 4.11 of the Disclosure Schedules, there are no claims related to the ASC, the Purchased Assets or the Assumed Liabilities pending under any such Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights. Seller has not received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of such Insurance Policies. All premiums due on such Insurance Policies have either been paid or, if not yet due, accrued. All such Insurance Policies: (a) are in full force and effect and enforceable in accordance with their terms; (b) are provided by carriers who are financially solvent; and (c) have not been subject to any lapse in coverage. Seller is not in default under or otherwise failed to comply with, in any material respect, any provision contained in any such Insurance Policy. The Insurance Policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the operation of the ASC and are sufficient for compliance with all applicable Laws and Contracts to which either Seller is a party or by which it is bound. True and complete copies of the Insurance Policies have been made available to Buyer.

Section 4.12    Legal Proceedings; Governmental Orders. Except as specified in Section 4.12 of the Disclosure Schedules, there are no Actions pending or, to any Seller Party's Knowledge, threatened against or by any Seller Party: (a) relating to or affecting the ASC, the Purchased Assets or the Assumed Liabilities; (b) alleging violation of any Health Care Laws; or (c) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action. There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the ASC.

Section 4.13    Compliance With Laws; Permits; Health Care Laws.

*Execution Version*

(a)     Each Seller Party has always complied and is now complying with all Laws applicable to the operation of the ASC as currently operated or the ownership and use of the Purchased Assets.

(b)     All Permits required for Seller to operate the ASC as currently operated or for the ownership and use of the Purchased Assets have been obtained by Seller and are valid and in full force and effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full. Section 4.13 of the Disclosure Schedules lists all current Permits issued to Seller which are related to the operation of the ASC as currently operated or the ownership and use of the Purchased Assets, including the names of the Permits and their respective dates of issuance and expiration. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in Section 4.13 of the Disclosure Schedules.

(c)     Each Seller Party has at all times complied and is now in compliance with all Health Care Laws.

Section 4.14   Environmental Matters. The operations of Seller with respect to the ASC and the Purchased Assets are currently and have been in compliance with all Environmental Laws. No Seller Party has received from any Person, with respect to the ASC or the Purchased Assets, any: (a) Environmental Notice or Environmental Claim; or (b) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date. There has been no Release of Hazardous Materials in contravention of Environmental Law with respect to the ASC or the Purchased Assets or any real property currently or formerly owned, leased or operated by Seller in connection with the ASC, and no Seller Party has not received an Environmental Notice that any of the ASC or the Purchased Assets or real property currently or formerly owned, leased or operated by Seller in connection with the ASC (including soils, groundwater, surface water, buildings and other structure located thereon) has been contaminated with any Hazardous Material which could reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Law by, Seller. No Seller Party is aware of or reasonably anticipates, as of the Closing Date, any condition, event or circumstance concerning the Release or regulation of Hazardous Materials that might, after the Closing Date, prevent, impede or materially increase the costs associated with the ownership, lease, operation, performance or use of the ASC or the Purchased Assets as currently carried out.

Section 4.15   Employee Benefit Matters.

(a)     Section 4.15 of the Disclosure Schedules contains a list of each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance equity, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off (PTO), medical, vision, dental, disability, welfare, Section 125 of the Code cafeteria, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto) which is or has been maintained, sponsored, contributed to or required to be contributed to by Seller for the benefit of any current or former employee, officer, director, retiree,

independent contractor or consultant of Seller or any spouse or dependent of such individual, or under which Seller has or may have any liability (each, a "Benefit Plan"). Each Benefit Plan has been established, administered and maintained in accordance with its terms and in compliance with all applicable federal, state and local laws.

(b)     Seller has not, during the past five years, maintained, established, sponsored, participated in or contributed to a Benefit Plan that is: (i) a "multi-employer plan" (as defined in Sections 3(37) or 4001(a)(3) of ERISA); (ii) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA); (iii) a "multiple employer plan" to which Section 413(c) of the Code applies; (iv) subject to Title IV of ERISA or Sections 412 or 430 of the Code; (v) "employee welfare benefit plan" (as defined in ERISA Section 3(1)) that provides benefits to or on behalf of any person following retirement or other termination of employment (other than to the extent required by Code Section 4980B), any multiemployer or multiple employer welfare arrangement, fund or plan (as defined under ERISA), or any "funded welfare plan" within the meaning of Code Section 419; or (vi) a non-qualified deferred compensation arrangement (as defined under Code Section 409(A)), or that contains any change in control provisions which would cause an increase or acceleration of benefits or vesting or contains any benefit entitlements (including severance pay, unemployment compensation, or any other type of payment) to employees or former employees of Seller.

(c)     There is no pending or, to any Seller Party's knowledge, threatened Action relating to a Benefit Plan (other than routine claims for benefits), and no Benefit Plan has within the three years prior to the date of this Agreement been the subject of an examination or audit by a Governmental Authority or an applicant or participant in any amnesty or similar program sponsored by any Governmental Authority.

Section 4.16    Employment Matters.

(a)     Section 4.16 of the Disclosure Schedules contains a list of all Persons who are employees, independent contractors or consultants of Seller as of the date hereof and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full-time or part-time); (iii) hire or retention date; (iv) current annual base compensation rate or contract fee; (v) commission, bonus or other incentive-based compensation; and (vi) a description of the fringe benefits provided to each such individual as of the date hereof. As of the date hereof, all compensation, including wages, commissions, bonuses, fees and other compensation, payable to all employees, independent contractors or consultants of Seller for services performed on or prior to the date hereof have been paid in full and there are no outstanding agreements, understandings or commitments of Seller with respect to any compensation, commissions, bonuses or fees.

(b)     Seller is in material compliance with: (i) all federal, state, local and foreign laws, regulations, rules, ordinances, and court an administrative orders dealing with employment and employment practices of any kind; (ii) all of the terms and conditions of employment of any kind with respect to the ASC; and (iii) all wage and hours requirements and regulations;

(c)     There is no labor dispute in progress or threatened against or involving Seller or the ASC;

(d)     Seller is not a party to any collective bargaining agreement with respect to the ASC, and there is no collective bargaining agreement currently being negotiated by Seller relating to the ASC; and

(e)     There is not currently and will not be on the Closing Date any written or oral agreement with any employee, independent contractor or consultants of Seller that is not terminable at will.

Section 4.17   <u>Taxes</u>.

(a)     All Tax Returns required to be filed by Seller for any Pre-Closing Tax Period have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all respects. All Taxes due and owing by Seller (whether or not shown on any Tax Return) have been, or will be, timely paid.

(b)     Seller has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other party, and has complied with all information reporting and backup withholding provisions of applicable Law.

(c)     No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller.

(d)     All deficiencies asserted, or assessments made, against Seller as a result of any examinations by any taxing authority have been fully paid.

(e)     Seller is not a party to any Action by any taxing authority. There are no pending or threatened Actions by any taxing authority.

(f)     There are no Encumbrances for Taxes upon any of the Purchased Assets nor, to any Seller Party's Knowledge, is any taxing authority in the process of imposing any Encumbrances for Taxes on any of the Purchased Assets (other than for current Taxes not yet due and payable).

(g)     Seller is not, nor has been, a party to, or a promoter of, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011 4(b).

Section 4.18   <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Seller.

*Execution Version*

Section 4.19    CARES Act.

(a)    Application and Use of PPP Loan Proceeds. Seller has properly applied for the PPP Loan in accordance with the terms of the Small Business Act and the CARES Act. Seller has used all of the proceeds of the PPP Loans first for Permitted Purposes that qualify the PPP Loans for forgiveness under Section 1106 of the CARES Act, and second, for other Permitted Purposes. At least 60% of the proceeds of the PPP Loans were used by Seller to fund "payroll costs" (as defined in the CARES Act) of Seller.

(b)    Consent. Seller has complied with the requirements of the SBA and the PPP Loan Documents relating to PPP Loan forgiveness, including, without limitation, completing and submitting its application for forgiveness to the PPP Lender, together with all supporting documentation, and establishing an interest-bearing escrow account controlled by the PPP Lender with funds equal to the outstanding balance of the PPP Loan.

Section 4.20    Full Disclosure. No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Seller Parties that the statements contained in this Article V are true and correct as of the date hereof.

Section 5.1    Organization and Authority of Buyer. Buyer is a limited liability company validly existing and in good standing under the Laws of the State of Michigan. Buyer has full limited liability company power and authority to enter into this Agreement and the Ancillary Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any Ancillary Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability partnership action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by all Seller Parties) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms. When each Ancillary Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms.

Section 5.2    No Conflicts; Consents. The execution, delivery and performance by Buyer of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the articles of organization, operating

agreement, or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

Section 5.3    <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Buyer.

Section 5.4    <u>Sufficiency of Funds</u>. Buyer has sufficient cash on hand or other sources of immediately available funds (including via financing) to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

Section 5.5    <u>Legal Proceedings</u>. There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

## ARTICLE VI
## COVENANTS

Section 6.1    <u>Conduct of Business Prior to the Closing</u>. From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), the Seller Parties shall: (x) operate the ASC in the ordinary course of business consistent with past practice; and (y) use reasonable best efforts to maintain and preserve intact Seller's current business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of Seller's employees, patients, lenders, suppliers, regulators and others having relationships with the operation of the ASC. Without limiting the foregoing, from the date hereof until the Closing Date, the Seller Parties shall or shall cause Seller to:

(a)    preserve and maintain all Permits required for the operation of the ASC as currently operated or the ownership and use of the Purchased Assets;

(b)    pay the debts, Taxes and other obligations of or related to the ASC when due;

(c)    maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(d)    continue in full force and effect without modification all Insurance Policies, except as required by applicable Law;

*Execution Version*

(e)     defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

(f)     perform all of its obligations under all Assigned Contracts;

(g)     maintain the Books and Records in accordance with past practice; and

(h)     comply in all material respects with all Laws applicable to the operation of the ASC or the ownership and use of the Purchased Assets.

Section 6.2     <u>Access to Information</u>. From the date hereof until the Closing, the Seller Parties shall: (a) afford Buyer and its Representatives full and free access to and the right to inspect all of the Leased Real Property, properties, assets, premises, Books and Records, Contracts, and other documents and data related to the operation of the ASC; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the ASC as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of the Seller Parties to cooperate with Buyer in its investigation of the ASC. Any investigation pursuant to this Section 6.2 shall be conducted in such manner as not to interfere unreasonably with the operation of the ASC. No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by any Seller Party in this Agreement.

Section 6.3     <u>No Solicitation of Other Bids</u>.

(a)     No Seller Party shall, and neither shall authorize or permit any of its respective Affiliates or any of its or their Representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal. Each Seller Party shall immediately cease and cause to be terminated, and shall cause their respective Affiliates and all of its and their Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. For purposes hereof, "<u>Acquisition Proposal</u>" means any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) relating to the direct or indirect disposition, whether by sale, merger or otherwise, of all or any portion of the ASC or the Purchased Assets.

(b)     In addition to the other obligations under this Section 6.3, each Seller Party shall promptly (and in any event within three Business Days after receipt thereof by any Seller Party or its respective Representative(s)) advise Buyer orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same.

(c)     Each Seller Party agrees that the rights and remedies for noncompliance with this Section 6.3 shall include having such provision specifically enforced by any court

*Asset Purchase Agreement – Page 24*

having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

Section 6.4     Notice of Certain Events.

(a)     From the date hereof until the Closing, the Seller Parties shall promptly notify Buyer in writing of:

(i)     any fact, circumstance, event or action the existence, occurrence or taking of which: (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by any Seller Party hereunder not being true and correct; or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in Section 7.2 to be satisfied;

(ii)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)     any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)     any Actions commenced or, to any Seller Party's Knowledge, threatened against, relating to or involving or otherwise affecting the ASC, the Purchased Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.12 or that relates to the consummation of the transactions contemplated by this Agreement.

(b)     Buyer's receipt of information pursuant to this Section 6.4 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by any Seller Party in this Agreement (including Section 8.2 and Section 9.1(b)) and shall not be deemed to amend or supplement the Disclosure Schedules.

Section 6.5     Employees and Employee Benefits.

(a)     Commencing on the Closing Date, Seller shall terminate its respective employees of the ASC who are actively at work on the Closing Date, and Buyer or its Affiliate shall offer employment to such employees for at least sixty (60) days post-Closing, subject to Buyer's standard employment policies, and thereafter on an "at will" basis, to any or all of such employees. Seller shall bear any and all obligations and liability under the WARN Act resulting from its employment losses pursuant to this Section 6.5.

(b)     Seller shall be solely responsible, and neither Buyer nor any of its Affiliate(s) shall have any obligations whatsoever for, any compensation or other amounts payable to any Seller's current or former employee, officer, director, independent contractor or consultant, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any

period relating to the service with Seller at any time on or prior to the Closing Date and Seller shall pay all such amounts to all entitled persons on or prior to the Closing Date.

(c)     Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident, or disability benefits brought by or in respect of its current or former employees, officers, directors, independent contractors or consultants of or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Seller also shall remain solely responsible for all worker's compensation claims of any of its current or former employees, officers, directors, independent contractors or consultants which relate to events occurring on or prior to the Closing Date. Seller shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

(d)     Each employee of Seller who becomes employed by Buyer or its Affiliate in connection with the transactions contemplated by this Agreement shall be eligible to receive the salary and benefits maintained for employees of Buyer or its Affiliates on substantially similar terms and conditions in the aggregate as are provided to similarly situated employees of Buyer or its Affiliates.

Section 6.6     <u>Confidentiality</u>. From and after the Closing, each Seller Party shall, and shall each cause its Affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the ASC, except to the extent that such Seller Party can show that such information: (a) is generally available to and known by the public through no fault of any Seller Party or any of its respective Affiliates or Representatives; or (b) is lawfully acquired by such Seller Party or any of their respective Affiliates or Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If any Seller Party or any of its respective Affiliates or Representatives is compelled to disclose any information by judicial or administrative process or by other requirements of Law, the Seller Parties shall promptly notify Buyer in writing and shall disclose only that portion of such information which the applicable Seller Party is advised by its counsel in writing is legally required to be disclosed, provided that the Seller Parties shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

Section 6.7     <u>Non-Solicitation Covenant</u>.

(a)     For a period of two years commencing on the Closing Date, no Seller Party shall, or shall permit any of its respective Affiliates to, directly or indirectly, hire or solicit any Person who is offered employment by Buyer or its Affiliate pursuant to Section 6.5(a) or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; provided, that nothing in this Section 6.7 shall prevent any Seller Party or any of its respective Affiliates from hiring: (i) any employee whose employment has been terminated by Buyer or its Affiliate; or (ii) after 180 days from the date of termination of employment, any employee whose employment has been terminated by the employee.

*Execution Version*

(b)     Each Seller Party acknowledges that a breach or threatened breach of this Section 6.7 would give rise to irreparable harm to Buyer and its Affiliates, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by a Seller Party of any such obligations, Buyer and its Affiliates shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(c)     Each Seller Party acknowledges that the restrictions contained in this Section 6.7 are reasonable and necessary to protect the legitimate interests of Buyer and its Affiliates and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this Section 6.7 should ever be adjudicated to exceed the time or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time other limitations permitted by applicable Law. The covenants contained in this Section 6.7 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

Section 6.8    <u>Governmental Approvals and Consents</u>.

(a)     Each party hereto shall, as promptly as possible: (i) make, or cause or be made, all filings and submissions required under any Law applicable to such party or any of its Affiliates; and (ii) use reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the Ancillary Documents. Each party shall cooperate fully with the other parties and their respective Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)     Each party hereto shall use its reasonable best efforts to give all notices to, and obtain all consents from, all third parties that are described in Section 4.2 of the Disclosure Schedules.

(c)     Without limiting the generality of the parties' undertakings pursuant to subsections (a) and (b) above, each of the parties hereto shall use all reasonable best efforts to:

(i)      respond to any inquiries by any Governmental Authority regarding antitrust or other matters with respect to the transactions contemplated by this Agreement or any Ancillary Document;

(ii)      avoid the imposition of any order or the taking of any action that would restrain, alter or enjoin the transactions contemplated by this Agreement or any Ancillary Document; and

(iii)      in the event any Governmental Order adversely affecting the ability of the parties to consummate the transactions contemplated by this Agreement or any Ancillary Document has been issued, to have such Governmental Order vacated or lifted.

(d)      All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments and proposals made by or on behalf of any party hereto before any Governmental Authority or the staff or regulators of any Governmental Authority, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between any party hereto with Governmental Authorities in the ordinary course of business, any disclosure which is not permitted by Law or any disclosure containing confidential information) shall be disclosed to the other parties hereunder in advance of any filing, submission or attendance, it being the intent that the parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments and proposals. Each party shall give notice to the other parties with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide the other party with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

(e)      Notwithstanding the foregoing, nothing in this Section 6.8 shall require, or be construed to require, Buyer or any of its Affiliates to agree to: (i) sell, hold, divest, discontinue or limit, before or after the Closing Date, any assets, businesses or interests of Buyer or any of its Affiliates; (ii) any conditions relating to, or changes or restrictions in, the operations of any such assets, businesses or interests which, in either case, could reasonably be expected to result in a Material Adverse Effect or materially and adversely impact the economic or business benefits to Buyer of the transactions contemplated by this Agreement and the Ancillary Documents; or (iii) any material modification or waiver of the terms and conditions of this Agreement.

Section 6.9    Medicare and Medicaid Provider Agreements. Buyer shall execute and file any and all forms, notices, consents and applications with Governmental Authorities as may be necessary to timely obtain or assume Seller's Medicare and Medicaid provider numbers, provider agreements and/or certifications, and shall use its best efforts to seek approval for transfer thereof from Seller to Buyer. Buyer agrees to accept automatic assignment of Seller's Medicare provider agreement. The Seller Parties shall reasonably cooperate with Buyer's obtaining or assumption of Seller's Medicare and Medicaid provider numbers, provider agreements and/or certifications.

Section 6.10    Interim Medicare Billing Period; Medicare Depository Account; Accounts Receivable.

(a)    Interim Medicare Billing Period. Seller authorizes Buyer to submit Medicare claims for services rendered to Medicare beneficiaries in Seller's name using Seller's Medicare provider number (the "Medicare Provider Number") during the period beginning on the Closing Date until the date on which the Centers for Medicare and Medicaid Services ("CMS") issues a tie-in notice and the fiscal intermediary has terminated Seller's right to submit claims under the Medicare Provider Number (the "Interim Medicare Billing Period"). The resulting revenue shall be treated as revenue of Buyer. During the Interim Medicare Billing Period, Buyer shall have the right to collect all accounts receivable submitted by Buyer during the Interim Medicare Billing Period.

(b)    By the Closing Date, Seller shall have executed such documentation as may be required by its depository bank to add such individuals designated by Buyer as a signatory on the bank account in which Seller receives Medicare and Medicaid reimbursement (the "Government Receivables Account"). As of the Closing Date, no Seller Party shall have the right to withdraw funds from the Government Receivables Account, issue checks on the Government Receivables Account, or otherwise instruct the depository bank with respect to the disposition of any funds deposited into the Government Receivables Account. Any amounts deposited into the Government Receivables Account relating to operations of the ASC after the Closing Date shall, be transferred by Buyer's designated signors into Buyer's operating account(s).

(c)    Accounts Receivable. Subject to the remaining provisions of this Section 6.10, Buyer acknowledges that, as of and after the Closing Date, Seller will have uncollected Accounts Receivable for services and goods rendered by Seller to patients of the ASC and Seller is entitled to such Accounts Receivable collected after the Closing Date. All amounts received by Buyer for Accounts Receivable for goods and services provided prior to the Closing Date shall be the sole property of Seller and to the extent such proceeds are held by Buyer, they shall be held in trust for the benefit of Seller. Within five Business Days of receipt of any amount representing payments in respect of goods or services provided before the Closing Date, Buyer shall remit to Seller to an account designated by Seller that portion of such Accounts Receivable it received attributable to billings for goods and services provided by Seller prior to the Closing Date. Furthermore, to the extent that Seller receives any payments in respect of goods or services provided by Buyer on or after the Closing Date, such payments shall be the sole property of Buyer (and to the extent such proceeds are held by Seller, they shall be held in trust for the benefit of Buyer). Within five Business Days of receipt of any amount representing payments in respect of goods or services provided on or after the Closing Date, Seller shall remit to Buyer to an account designated by Buyer that portion of such payments received attributable to billings for goods and services provided by Buyer on or after the Closing Date (and to the extent such proceeds are held by Seller, they shall be held in trust for the benefit of Buyer).

(d)    Within five Business Days of receipt of any amount representing payments in respect of goods or services provided before the Closing Date, Seller shall deliver to

*Execution Version*

Buyer copies of all portions of remittance advices received in the previous month which relate to payments which Buyer is required under this Agreement to deliver to Seller, and any other similar documentation received and relating to payment for goods and services provided by Buyer after the Closing Date. Additionally, after the Closing Date, Seller, or its designee, shall have the right to review and audit all documents and records related to Accounts Receivable upon at least five Business Days' notice to Buyer. Buyer will provide adequate space and equipment at the ASC to permit Seller or its Representative(s) to review and audit the books and records related to Accounts Receivable necessary to determine accurately the processing, collection and remittance as contemplated by this Agreement of any and all Accounts Receivable after the Closing Date.

(e)     Within five Business Days of receipt, Seller shall deliver to Buyer copies of all correspondence and documentation relating to payments or payment withhold issues on Accounts Receivable which affect payments made to or to be received by Buyer.

Section 6.11   <u>Tail Malpractice Policy</u>. Seller will ensure that tail insurance (i.e., an extended reporting endorsement) or occurrence based insurance covering potential future malpractice claims relating to periods prior to the Closing Date with limits of liability no less than $1,000,000 per claim and $3,000,000 annual aggregate for Seller is in force an fully paid on or before the Closing.

Section 6.12   <u>Books and Records</u>. The Seller Parties shall retain the Books and Records of Seller (including personnel files) relating to periods prior to the Closing.

Section 6.13   <u>Closing Conditions</u>. From the date hereof until the Closing, each party hereto shall use reasonable best efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in Article VII hereof.

Section 6.14   <u>Public Announcements</u>. Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other parties (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

Section 6.15   <u>Bulk Sales Laws</u>. The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer; it being understood that any Liabilities arising out of the failure of Seller to comply with the requirements and provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction which would not otherwise constitute Assumed Liabilities shall be treated as Excluded Liabilities.

Section 6.16   <u>Transfer Taxes</u>. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Ancillary Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and

Buyer shall cooperate with respect thereto as necessary).

Section 6.17   Tax Clearance Certificates. Seller shall notify the Michigan Department of Treasury of the transactions contemplated by this Agreement in the form and manner required by such taxing authorities, if the failure to make such notifications or receive any available tax clearance certificate (a "Tax Clearance Certificate") could subject Buyer to any Taxes of Seller. If any taxing authority asserts that Seller is liable for any Tax, Seller shall promptly pay any and all such amounts and shall provide evidence to Buyer that such liabilities have been paid in full or otherwise satisfied.

Section 6.18   CARES Act.

(a)      Seller covenants and agrees that Seller will: (i) keep necessary and appropriate records relating to the utilization of the proceeds of PPP Loan and its application for forgiveness; and (ii) provide Buyer, from time to time upon Buyer's request, with updates regarding forgiveness for the PPP Loan.

(b)      Seller covenants and agrees that it will use commercially reasonable efforts to satisfy the requirements for forgiveness of the PPP Loan, or the largest amount of such loans as is permitted under the CARES Act, as set forth in Section 1106 of the CARES Act. Seller further covenants and agree that it will (i) promptly take all applicable actions, not later than 45 days after the PPP Lender begins accepting applications for forgiveness of PPP Loans, to apply for forgiveness under Section 1106 of the CARES Act and the Small Business Act and the regulations implementing Section 1106; and (ii) provide Buyer with prompt written notice of: (x) the forgiveness (whole or partial) of the PPP Loan; and/or (y) the denial (in whole or in part) of the PPP Loan to qualify for forgiveness under the CARES Act.

(i)      Seller shall remain solely liable for any amounts not forgiven under the PPP Loan, and the Seller Parties shall remain solely liable for the repayment of any such amounts. All amounts not forgiven shall be promptly repaid pursuant to the terms of the PPP Escrow Agreement. Buyer shall not assume any obligations related to any PPP Loan.

Section 6.19   Further Assurances. Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1   Conditions to Obligations of All Parties. The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)     No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)     Seller shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 4.2 in form and substance reasonably satisfactory to Buyer, and no such consent, authorization, order and approval shall have been revoked.

(c)     Either:

(i)     The real estate transaction between the landlord of the Leased Real Property and Fountain View Fund, LLC or its Affiliate regarding the Leased Real Estate (the "Real Estate Transaction") shall have closed and either: (A) a Lease Termination shall have been duly executed by the parties required to terminate the Lease and release its guarantors; or (B) if the Lease is not terminated, the Landlord of the Leased Real Property, Seller and Buyer shall have executed an Assignment and Assumption of Lease; or

(ii)     If the Real Estate Transaction shall not have closed, then the landlord of the Leased Real Property shall have consented to an Assignment and Assumption of Lease.

Section 7.2   Conditions to Obligations of Buyer. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of the Seller Parties contained in Section 4.1 and Section 4.18, the representations and warranties of the Seller Parties contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of the Seller Parties contained in Section 4.1 and Section 4.18 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     The Seller Parties shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the

Closing Date; provided, that, with respect to agreements, covenants and conditions that are qualified by materiality, the Seller Parties shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)     No Action shall have been commenced against any party hereto which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)     All approvals, consents and waivers that are listed on Section 4.2 of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(e)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(f)     The Seller Parties shall have delivered to Buyer duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.2(a).

(g)     Buyer shall have received all Permits that are necessary for it to conduct the ASC as conducted by Seller as of the Closing Date.

(h)     All Encumbrances relating to the Purchased Assets shall have been released in full and the Seller Parties shall have delivered to Buyer written evidence, in form satisfactory to Buyer in its sole discretion, of the release of such Encumbrances.

(i)     Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied (the "Seller Closing Certificate").

(j)     Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the managers of Seller authorizing the execution, delivery and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(k)     The Seller Parties shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

Section 7.3     <u>Conditions to Obligations of the Seller Parties</u>. The obligations of the Seller Parties to consummate the transactions contemplated by this Agreement shall be subject to the

fulfillment or the Seller Parties' waiver, at or prior to the Closing, of each of the following conditions:

(a) Other than the representations and warranties of Buyer contained in Section 5.1 and Section 5.3, the representations and warranties of Buyer contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Buyer contained in Section 5.1 and Section 5.3 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b) Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date; provided, that, with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c) No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d) All approvals, consents and waivers that are listed on Section 5.2 of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to the Seller Parties at or prior to the Closing.

(e) Buyer shall have delivered to the Seller Parties duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.2(b).

(f) The Seller Parties shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied (the "Buyer Closing Certificate").

(g) The Seller Parties shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the managers of Buyer authorizing the execution, delivery and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(h)     Buyer shall have delivered to the Seller Parties such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

# ARTICLE VIII
# INDEMNIFICATION

Section 8.1     <u>Survival</u>. Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is 18 months from the Closing Date; provided, that the representations and warranties in: (a) Section 4.1, Section 4.5, Section 4.6, Section 4.18, Section 5.1, and Section 5.3 shall survive indefinitely; (b) Section 4.13(c) shall survive for a period of six years after the Closing; and (c) Section 4.14, Section 4.15, and Section 4.17 shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 60 days. All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

Section 8.2     <u>Indemnification By the Seller Parties</u>. Subject to the other terms and conditions of this Article VIII, the Seller Parties shall jointly and severally indemnify and defend each of Buyer and its Affiliates and their respective Representatives (collectively, the "<u>Buyer Indemnitees</u>") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of the Seller Parties contained in this Agreement, the Ancillary Documents or in any certificate or instrument delivered by or on behalf of any Seller Party pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by any Seller Party pursuant to this Agreement, the Ancillary Documents or any certificate or instrument delivered by or on behalf of a Seller Party pursuant to this Agreement;

(c)     any Excluded Asset or any Excluded Liability; or

(d)     any Third-Party Claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of any Seller Party or its Affiliate(s) (other than the Purchased Assets or Assumed Liabilities) conducted, existing or arising on or prior to the Closing Date.

Section 8.3    <u>Indemnification By Buyer</u>. Subject to the other terms and conditions of this Article VIII, Buyer shall indemnify and defend Seller Party and its Affiliate(s) and their respective Representatives (collectively, the "<u>Seller Party Indemnitees</u>") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Seller Party Indemnitees based upon, arising out of, with respect to or by reason of:

(a)    any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement; or

(c)    any Assumed Liability.

Section 8.4    <u>Certain Limitations</u>. The indemnification provided for in Section 8.2 and Section 8.3 shall be subject to the following limitations:

(a)    The Seller Parties shall not be liable to the Buyer Indemnitees for indemnification under Section 8.2(a) until the aggregate amount of all Losses in respect of indemnification under Section 8.2(a) exceeds $50,000 (the "<u>Basket</u>"), in which event the Seller Parties shall be required to pay or be liable for all such Losses from the first dollar. The aggregate amount of all Losses for which Seller shall be liable pursuant to Section 8.2(a) shall not exceed the Purchase Price (the "<u>Cap</u>").

(b)    Buyer shall not be liable to the Seller Party Indemnitees for indemnification under Section 8.3(a) until the aggregate amount of all Losses in respect of indemnification under Section 8.3(a) exceeds the Basket, in which event Buyer shall be required to pay or be liable for all such Losses from the first dollar. The aggregate amount of all Losses for which Buyer shall be liable pursuant to Section 8.3(a) shall not exceed the Cap.

(c)    Notwithstanding the foregoing, the limitations set forth in Section 8.4(a) and Section 8.4(b) shall not apply to Losses based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any representation or warranty in Section 4.1, Section 4.5, Section 4.18, Section 5.1 and Section 5.3.

(d)    For purposes of this Article VIII, any inaccuracy in or breach of any representation or warranty shall be determined without regard to any materiality, Material Adverse Effect or other similar qualification contained in or otherwise applicable to such representation or warranty.

Section 8.5    <u>Indemnification Procedures</u>. The party or parties making a claim under this Article VIII is referred to as the "<u>Indemnified Party</u>", and the party or parties against whom such claims are asserted under this Article VIII is referred to as the "<u>Indemnifying Party</u>".

(a)     Third-Party Claims. If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "Third-Party Claim") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 calendar days after receipt of such notice of such Third-Party Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third-Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense; provided, that if the Indemnifying Party is a Seller Party, such Indemnifying Party shall not have the right to defend or direct the defense of any such Third-Party Claim that: (x) is asserted directly by or on behalf of a Person that is a supplier or patient or other customer of the ASC; or (y) seeks an injunction or other equitable relief against the Indemnified Party. In the event that the Indemnifying Party assumes the defense of any Third-Party Claim, subject to Section 8.5(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third-Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right to participate in the defense of any Third-Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel shall be at the expense of the Indemnified Party, provided, that if in the reasonable opinion of counsel to the Indemnified Party: (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required. If the Indemnifying Party elects not to compromise or defend such Third-Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third-Party Claim, the Indemnified Party may, subject to Section 8.5(b), pay, compromise, defend such Third-Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third-Party Claim. Each party hereto shall cooperate with each other in all reasonable respects in connection with the defense of any Third-Party Claim, including making available (subject to the provisions of Section 6.6) records relating to such Third-Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third-Party Claim.

(b)      Settlement of Third-Party Claims. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party, except as provided in this Section 8.5(b). If a firm offer is made to settle a Third-Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third-Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense pursuant to Section 8.5(a), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

(c)      Direct Claims. Any Action by an Indemnified Party on account of a Loss which does not result from a Third-Party Claim (a "Direct Claim") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have 30 days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such 30 day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

Section 8.6      Payments. Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this Article VIII, the Indemnifying Party shall satisfy its obligations within 15 Business Days of such final, non-appealable adjudication by wire transfer of immediately available funds. The parties hereto agree that should an Indemnifying Party not make

full payment of any such obligations within such 15 Business Day period, any amount payable shall accrue interest from and including the date of agreement of the Indemnifying Party or final, non-appealable adjudication to and including the date such payment has been made at a rate per annum equal to prime rate as defined by The Wall Street Journal then in effect. Such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed.

Section 8.7    <u>Tax Treatment of Indemnification Payments</u>. All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

Section 8.8    <u>Effect of Investigation</u>. The representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its Representatives) or by reason of the fact that the Indemnified Party or any of its Representatives knew or should have known that any such representation or warranty is, was or might be inaccurate or by reason of the Indemnified Party's waiver of any condition set forth in Section 7.2 or Section 7.3, as the case may be.

Section 8.9    <u>Exclusive Remedies</u>. Subject to Section 6.7 and Section 10.11, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from fraud, criminal activity or willful misconduct on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article VIII. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this Article VIII. Nothing in this Section 8.9 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled or to seek any remedy on account of any party's fraudulent, criminal or intentional misconduct.

## ARTICLE IX
## TERMINATION

Section 9.1    <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of the Seller Parties and Buyer;

(b)    by Buyer by written notice to the Seller Parties if:

(i)    Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by the Seller Parties pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article

VII and such breach, inaccuracy or failure has not been cured by Seller within ten days of Seller's receipt of written notice of such breach from Buyer; or

(ii)      any of the conditions set forth in Section 7.1 or Section 7.2 shall not have been fulfilled by December 31, 2020, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing. Notwithstanding the foregoing, in the event Buyer's ability to fulfill the terms of Section 9.1(c)(ii) shall be extended until January 31, 2021, the Seller Parties' ability to fulfill this Section 9.1(b)(ii) shall also be extended until January 31, 2021;

(c)      by the Seller Parties by written notice to Buyer if:

(i)      no Seller Party is then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure has not been cured by Buyer within ten days of Buyer's receipt of written notice of such breach from Seller; or

(ii)      any of the conditions set forth in Section 7.1 or Section 7.3 shall not have been fulfilled by December 31, 2020, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing. Notwithstanding the foregoing, in the event the Closing does not occur by 11:59 p.m. on December 31, 2020, Buyer shall have the option to pay Seller an additional deposit in the amount of $100,000 (the "Additional Deposit") creditable toward the Purchase Price at Closing, by wire transfer of immediately available funds to an account or accounts designated in writing by the Seller Parties, to extend the ability to fulfill this Section 9.1(c)(ii) until January 31, 2021. The Additional Deposit shall be nonrefundable unless any Seller Party materially breach any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)      by Buyer or Seller in the event that: (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

Section 9.2    Effect of Termination. In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)      as set forth in this Article IX and Section 6.6 and Article X hereof; and

(b)      that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

*Execution Version*

Section 9.3    <u>Deposit and Termination Fees</u>. Notwithstanding Section 9.2:

(a)    If this Agreement is terminated by the parties hereto in accordance with Section 9.1(a) or Section 9.1(d) of this Agreement, by Buyer in accordance with Section 9.1(b)(ii) or by Seller in accordance with Section 9.1(c)(ii), then the Deposit shall be returned to Buyer.

(b)    If this Agreement is terminated by Seller in accordance with Section 9.1(c)(i) (as to a material breach by Buyer) then the Deposit shall be delivered to the Seller Parties.

(c)    If this Agreement is terminated by Buyer in accordance with Section 9.1(b)(i) (as to a material breach by the Seller Parties) then the Deposit shall be returned to Buyer.

**ARTICLE X**
**MISCELLANEOUS**

Section 10.1   <u>Expenses</u>. Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

Section 10.2   <u>Notices</u>. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.2):

If to any Seller Party:

> Surgical Center of Southfield, LLC
> d/b/a Fountain View Surgery Center
> 29110 Inkster Road, Suite 100
> Southfield, MI 48034
> Email: david@williamscs.com
> Attention: David W. Williams, Manager

*with a copy to*:

> Dickinson Wright, PLLC
> 350 South Main Street, Suite 300

*Execution Version*

Ann Arbor, MI 48104
E-mail: PDomas@dickinson-wright.com
Attention: Peter J. Domas

If to Buyer:

Spine & Joint Surgical Institute of Michigan Southfield LLC
c/o Hillcrest Capital Partners, LLP
5140 Coolidge Highway, Suite 102
Royal Oak, MI 48073
Email: abe@hillcrestcapitalpartners.com
Attention: Abe Baydoun

*with copies to*:

Spine & Joint Surgical Institute of Michigan Southfield LLC
c/o KKM Global Group
18430 Mack Road
Grosse Pointe Farms, MI 48236
Email: dknott@kkmhealthcare.com
Attention: David Knott

*and*

Dykema Gossett PLLC
2723 S. State Street, Suite 400
Ann Arbor, MI 48104
Email: SMooradian@dykema.com
Attention: Serj Mooradian

*and*

CND Law
33762 Schoolcraft Road
Livonia, MI 48150
Email: jgreene@cnd-law.com
Attention: Joel Greene

Section 10.3   <u>Interpretation</u>. For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed

without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

Section 10.4   <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 10.5   <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in Section 6.7(c), upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 10.6   <u>Entire Agreement</u>. This Agreement and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

Section 10.7   <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; provided, however, that prior to the Closing Date, Buyer may, without the prior written consent of Seller or Seller's consent, assign all or any portion of its rights under this Agreement to one or more of its Affiliates. No assignment shall relieve the assigning party of any of its obligations hereunder.

Section 10.8   <u>No Third-Party Beneficiaries</u>. Except as provided in Article VIII, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.9   <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or

*Execution Version*

partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 10.10  Governing Law; Waiver of Jury Trial.

(a)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan without giving effect to any choice or conflict of law provision or rule (whether of the State of Michigan or any other jurisdiction).

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE ANCILLARY DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10(B).

Section 10.11  Guaranty by Hillcrest. By joining in this Agreement, Hillcrest Capital Partners LLP, a Michigan limited liability partnership ("Hillcrest"), subject to the conditions listed in Section 7.1 and Section 7.2 having been satisfied by Closing, guarantees to Seller the full and prompt payment by Buyer the Purchase Price, less the Deposit and the Additional Deposit (if applicable). Subject to the conditions listed in Section 7.1 and Section 7.2 having been satisfied by Closing, if Buyer does not pay the Purchase Price to Seller at the Closing, Hillcrest shall promptly pay the balance of the Purchase Price less the Deposit and the Additional Deposit (if applicable) (to ensure that Seller receives the entire Purchase Price). This guaranty of Hillcrest is an absolute, irrevocable, primary, and continuing guaranty of performance and payment, and is not a guaranty of collection. This guaranty shall remain in full force and effect (and shall remain in effect notwithstanding any amendment to this Agreement) until all of Buyer's obligations with respect to payment of the Purchase Price are fulfilled, paid, observed, performed or discharged in full.Specific Performance. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 10.13  Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means

*Execution Version*

of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS:**

**SURGICAL CENTER OF SOUTHFIELD, LLC D/B/A FOUNTAIN VIEW SURGERY CENTER**

By: _____
David W. Williams
Manager

**SELLERS' OWNERS:**

_____
Atlas Orthopedics, PLLC,
By: Jeffrey J. Carroll, D.O., its Member

Makino Investments, LLC

_____
Makino Investments, L.L.C.
Mark L. Goldberger, D.O, its Member

_____
Medical Continuum Management, LLC
By David W. Williams, its Manager

_____
Robert D. Swift, D.O.

_____
David W. Williams

_____
Jeffrey J. Carroll, D.O.

_____
Mark L. Goldberger, D.O.

*Asset Purchase Agreement – Seller's Signature Page*

*Execution Version*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS:**

**SURGICAL CENTER OF SOUTHFIELD, LLC D/B/A FOUNTAIN VIEW SURGERY CENTER**

By: _____
    David W. Williams
    Manager

**SELLERS' OWNERS:**

_____
Atlas Orthopedics, PLLC,
By: Jeffrey J. Carroll, D.O., its Member

_____
Makino Investments, L.L.C.
Mark L. Goldberger, D.O, its Member

_____
Medical Continuum Management, LLC
By David W. Williams, its Manager

_____
Robert D. Swift, D.O.

_____
David W. Williams

_____
Jeffrey J. Carroll, D.O.

_____
Mark L. Goldberger, D.O.

*Asset Purchase Agreement – Seller's Signature Page*

*Execution Version*

        IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

                                    **BUYER:**

                                    **SPINE & JOINT SURGICAL INSTITUTE OF MICHIGAN SOUTHFIELD LLC**

                                    By _____
                                            Abe Baydoun
                                            Authorized Agent


        For the purposes of Section 10.11 of this Agreement only:


                                    **HILLCREST CAPITAL PARTNERS, LLP**, a
                                    Michigan limited liability partnership,

                                    By _____
                                            Abe Baydoun
                                            Its: CEO

# EXHIBIT A

## ALLOCATION SCHEDULE

4814-7022-9198.6

## AMENDMENT TO ASSET PURCHASE AGREEMENT

Amendment to Asset Purchase Agreement (the "Amendment"), dated as of January 30, 2021 (the "Effective Date"), between Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center, a Michigan limited liability company ("Seller"), and the equity owners of Seller: Medical Continuum Management, LLC, Atlas Orthopedics, PLLC, Makino Investments, L.L.C., Robert D. Swift, D.O., David W. Williams, Jeffrey J. Carroll, D.O., Mark L. Goldberger, D.O. (who together with Seller are collectively referred to as the "Seller Parties" and each, a "Seller Party") and Spine & Joint Surgical Institute of Michigan Southfield LLC, a Michigan Limited liability company ("Buyer").

WHEREAS, the Parties have entered into an Asset Purchase Agreement, dated as of December 9, 2020 (the "Existing Agreement"); and

WHEREAS, the Parties hereto desire to amend the Existing Agreement on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Definitions. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the Existing Agreement.

2.      Additional Deposit. The Parties acknowledge and agree that Buyer paid $175,000 to the Seller Parties on January 29, 2020 to be held in escrow until the full execution of this Amendment.

3.      Amendments to the Existing Agreement. As of the full execution of this Agreement by the Parties, the Existing Agreement is hereby amended or modified as follows:

(a)     The definition of the term "Additional Deposit" is deleted and replaced by the following:

"Additional Deposit" means $175,000 paid on January 29, 2021 in connection with that certain Amendment to Asset Purchase Agreement among the parties to this Agreement.

(b)     Section 2.5 is deleted and replaced by the following:

Section 2.5   Purchase Price; Deposit. The aggregate purchase price for the Purchased Assets shall be $4,500,000 (the "Purchase Price"), plus the assumption of the Assumed Liabilities. The parties acknowledge that Buyer has paid deposits of $300,000 (collectively the "Deposit") that shall be credited toward the Purchase Price. The balance of the Purchase Price ($4,200,000) shall be paid as provided in Section 3.2(b)(i). In addition to the Deposit, the Buyer has paid the Additional Deposit, which shall not be credited toward the Purchase Price.

1

(c)     The following phrase is deleted from Section 3.1: ", on the later of: (a) December 31, 2020; and (b)" and replaced by the word "on".

(d)     The following phrase is deleted from Section 3.2(b)(i): "and the Additional Deposit (if applicable)".

(e)     A new Section 6.20 is created as follows:

Section 6.20   <u>Certain Expenses of Seller</u>. Buyer agrees to pay, in addition to the Purchase Price:

(a)     In the event the Closing has not occurred by 11:59 p.m. on March 2, 2021, Seller's "Rent" as provided in Seller's landlord's March invoice by wire of immediately available funds on March 3, 2021; and

(b)     At the Closing or on March 10, 2021, whichever is earlier, and in addition to the Purchase Price:

(i) $2,000 for each day between March 1, 2021 and March 5, 2021 that the Closing has not occurred; plus

(ii)     Seller's reasonable expenses actually paid for operating the ASC between March 1, 2021 and the earlier of March 5, 2021 or Closing, as invoiced by Seller to Buyer and substantiated by supporting documentation;

(f)     The second sentence of Section 9.1(b)(ii) is deleted in its entirety.

(g)     Section 9.1(c)(ii) is deleted in its entirety and replaced by the following:

(ii)     any of the conditions set forth in Section 7.1 or 7.3 shall not have been fulfilled by March 5, 2021, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing. Notwithstanding anything in the Agreement or the Amendment to the contrary, the Deposit shall be nonrefundable, provided, however the Additional Deposit is refundable, if any Seller Party materially breaches any of the covenants, agreements or conditions hereof to be performed or complied with by Seller Parties prior to the Closing.

(h)     A new Section 9.1(c)(iii) is created as follows:

(iii) Notwithstanding any other provision of this Agreement to the Contrary, Buyer may, by providing Seller notice no later than March 1, 2021, elect to have a Closing on March 5, 2020, despite the conditions to Closing set forth in Section 7.1(c) not being fulfilled. In such event, the Parties will close by Buyer purchasing Seller's assets pursuant to the terms of this Agreement, and the Parties entering into a management and/or lease agreement, or other similar arrangement negotiated in good faith between Seller and Buyer with customary terms for similar

arrangements (including but not limited to Buyer assuming all obligations of operating the ASC post-Closing, and Seller retaining all obligations for operating the ASC pre-Closing). Pursuant to such arrangement, Seller will maintain its freestanding surgical outpatient facility license until such time as determined by Buyer, which shall be no later than three (3) months after the Closing. The parties agree to cooperate in good faith with respect to the transfer of the license and all associated accreditation and payor enrollments as reasonably requested by Buyer.

(i)     The following is deleted from Section 10.11 in each of the two instances in which it appears: "and the Additional Deposit (if applicable)".

4.     <u>Date of Effectiveness; Limited Effect</u>. This Amendment will be deemed effective as of the Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Existing Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the Parties. Without limiting the generality of the foregoing, the amendments contained herein will not be construed as an amendment to or waiver of any other provision of the Existing Agreement or as a waiver of or consent to any further or future action on the part of either Party that would require the waiver or consent of the other Party. On and after the Effective Date, each reference in the Existing Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference to the Existing Agreement in any other agreements, documents, or instruments executed and delivered pursuant to, or in connection with, the Existing Agreement, will mean and be a reference to the Existing Agreement as amended by this Amendment.

5.     <u>Miscellaneous</u>.

(a)     This Amendment is governed by and construed in accordance with, the laws of the State of Michigan, without regard to the conflict of laws provisions of such State.

(b)     This Amendment shall inure to the benefit of and be binding upon each of the Parties and each of their respective permitted successors and permitted assigns.

(c)     The headings in this Amendment are for reference only and do not affect the interpretation of this Amendment.

(d)     This Amendment may be executed in counterparts, each of which is deemed an original, but all of which constitute one and the same agreement. Delivery of an executed counterpart of this Amendment electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Amendment.

(e)     This Amendment constitutes the sole and entire agreement between the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

(f)     Each Party shall pay its own costs and expenses in connection with this Amendment (including the fees and expenses of its advisors, accountants, and legal counsel).

(g)     Hillcrest Capital Partners LLP, a Michigan limited liability partnership ("Hillcrest") reaffirms its obligations under Section 10.11 of the Existing Agreement, and as such obligations would be modified by this Amendment.

*[Signature Pages to Follow]*

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the Effective Date.

[Seller Parties]

**SELLER:**

**SURGICAL CENTER OF SOUTHFIELD, LLC D/B/A FOUNTAIN VIEW SURGERY CENTER**

By: _E-SIGNED by David Williams on 2021-01-31 21:46:05 GMT_

Name: David W. Williams

Title: Manager

**SELLER'S OWNERS:**

**ATLAS ORTHOPEDICS**

By: _E-SIGNED by Jeffrey Carroll, D.O. on 2021-02-01 12:42:15 GMT_

Name: Jeffrey J. Carroll, D.O.

Title: Member

**MAKINO INVESTMENTS**

By: _E-SIGNED by Mark Goldberger, D.O. on 2021-01-31 19:04:07 GMT_

Name: Mark L. Goldberger, D.O.

Title: Member

**MEDICAL CONTINUUM MANAGEMENT, LLC**

By: _E-SIGNED by David Williams on 2021-01-31 21:46:08 GMT_

Name: David W. Williams

Title: Manager

**JEFFREY J. CARROLL, D.O.**

_E-SIGNED by Jeffrey Carroll, D.O. on 2021-02-01 12:42:18 GMT_

**MARK L. GOLDBERGER, D.O.**

_E-SIGNED by Mark Goldberger, D.O. on 2021-01-31 19:04:09 GMT_

**DAVID W. WILLIAMS**

_E-SIGNED by David Williams on 2021-01-31 21:46:10 GMT_

**ROBERT D. SWIFT, D.O.**

_E-SIGNED by Robert Swift, D.O on 2021-01-31 21:20:12 GMT_

[Buyer Parties]

5

**BUYER:**

**SPINE & JOINT SURGICAL INSTITUTE OF MICHIGAN SOUTHFIELD LLC**

By: _____
Name: Abe Baydoun
Title: Authorized Agent

For the purposes of Section 5(g) of this Amendment and Section 10.11 of the Existing Agreement only:

**HILLCREST CAPITAL PARTNERS, LLP**

By: _____
Name: Abe Baydoun
Title: CEO

4822-9422-9209.5

6